## SINCLAIR REFINING CO. v. SCHAFF.

(Circuit Court of Appeals, Eighth Circuit. August 2, 1921.)

No. 5583.

Carriers ⬅️100 (1)—Strike cannot exempt from payment of demurrage charges.

Under the Interstate Commerce Acts the charge of demurrage by a railroad company for detention of cars by a shipper or consignee is not a matter of contract between the parties, but the rates fixed by the tariff schedules filed must be charged and enforced, and it is not a defense to an action to collect such charges that the detention was occasioned by a strike, or was by orders of a sheriff, prohibiting moving of the cars to prevent inciting mob violence.

In Error to the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Action at law by Charles E. Schaff, receiver of the Missouri, Kansas & Texas Railway, against the Sinclair Refining Company. Judgment for plaintiff, and defendant brings error. Affirmed.

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
275 F.—49

J. M. McCune, of Kansas City, Mo. (Edward H. Chandler, Summers Hardy, and William O. Beall, all of Tulsa, Okl., on the brief), for plaintiff in error.

W. W. Brown, of Kansas City, Mo. (O. T. Atherton, of Parsons, Kan., on the brief), for defendant in error.

Before HOOK, Circuit Judge, and COTTERAL and JOHNSON, District Judges.

JOHNSON, District Judge. In the court below this cause was submitted upon a stipulation filed by the parties, in which it is agreed that the allegations of fact contained in the amended petition of the plaintiff, Charles E. Schaff, receiver for the Missouri, Kansas & Texas Railway, are true, and that the allegations of fact contained in the affirmative defense set up in the answer of the defendant, Sinclair Refining Company, are true.

From the amended petition of the plaintiff it appears that under tariffs duly published and filed with the Interstate Commerce Commission certain demurrage charges accrued in favor of the plaintiff, as receiver of the Missouri, Kansas & Texas Railway, on cars' delivered by him to the defendant at its refining plant in Coffeyville, in the state of Kansas. The receiver brought this action in the court below to recover said demurrage charges. As a defense the Refining Company in its answer alleged:

"On or about October 31, 1917, a large number of its employees at its refinery plant at Coffeyville, Montgomery county, Kan., went on a strike, and continued on such strike until on or about December 6, 1917; that on and after October 31, 1917, or immediately prior thereto, certain cars were delivered by said plaintiff to said defendant for loading or unloading, and when the said strikers went on strike they assembled in force around said plant of this defendant, seriously assaulted and beat various employees of defendant, who remained at their work notwithstanding said strike, and committed other acts of violence, and the acts and deeds of said strikers assumed the proportions of mob violence, and said strikers threatened the plant of said defendant with destruction in the event defendant should attempt to operate its said plant, or load or unload or move any of said cars; that said strikers picketed the said plant, and remained in force about the same, and forcibly prevented defendant from operating its said plant, or loading or unloading, moving or removing, any of said cars; that the sheriff of Montgomery county, Kan., and his deputies, intervened in an effort to protect the property of this defendant, and permit said defendant to operate its plant without hindrance from said strikers, and the defendant had a sufficient number of loyal employees who were ready and willing to load and unload said cars, and it attempted to do so, not only with the aid of its said employees, but also through the aid of outside agencies and at other places than at its said plant, but the said strikers forcibly prevented the defendant from so doing; that the said sheriff and his deputies could not control the said strikers, and in order to protect life and the property of this defendant and other persons and corporations, the said sheriff ordered the agents and servants of this defendant to carry on no operations at said plant, and not to load, unload, move or remove any railway cars consigned to defendant or located at this plant; that appeal was made to the proper authorities for troops and military assistance, for the purpose of preserving order at said plant, and to permit the defendant to operate the same, together with said cars, but it was not until the representatives of the military authorities arrived at said plant that said defendant was able to operate said plant, and to load, unload, move, and remove any of said cars; that because of the interposition of the superior unlawful authority exercised by the strikers, over which this

defendant had no control, and because of the orders and directions of the sheriff of Montgomery county, Kan., as hereinbefore set forth, said defendant was prevented from loading, unloading, moving, or removing any of said cars, and that if any of the demurrage accrued as alleged in said petition it was solely caused by virtue of the unlawful acts of said strikers, and the superior mob violence, and orders and directions of the peace officers of said county, to wit, the duly elected and acting sheriff of Montgomery county, Kan.; that without delay and as soon as order was restored at said plant this defendant caused said cars to be loaded, unloaded, and moved, and said cars were immediately placed at the disposition of said plaintiff."

The allegations of fact contained in the above defense are, as already stated, admitted by the receiver to be true. A jury was waived and the cause submitted to the trial court on the stipulation for decision. The receiver had judgment, and the Refining Company brings error.

It is the contention of the plaintiff in error that the matters set up in its answer, and admitted by the defendant in error to be true, constitute a good defense to the action. It is argued that, as the delay in the return of the cars on which the demurrage charges accrued was caused by the unlawful acts of strikers, over whom the company had no control, and whom it was powerless to resist, it should be excused for the delay and relieved from making payment. In support of this proposition counsel for the plaintiff in error cite: Geismer v. Lake Shore & M. S. R. Co., 102 N. Y. 563, 7 N. E. 830, 55 Am. Rep. 837; Haas v. Kansas City, Ft. S. & G. R. Co., 81 Ga. 792, 7 S. E. 629, in which the delay of the carrier in making delivery of goods being transported by it was excused when caused by a strike of its employees or the employees of a connecting line; Empire Transportation Co. v. Philadelphia & Reading Coal & Iron Co., 77 Fed. 919, 23 C. C. A. 564, 35 L. R. A. 623, in which a strike of the employees of the charterer was held to excuse delay in unloading vessel; The Richland Queen, 254 Fed. 668, 166 C. C. A. 166, in which delay in completing repairs on vessel in dry dock held reasonable in view of strike of employees of Dock Company.

It is argued, in the second place, that since the sheriff of the county ordered plaintiff in error to carry on no operations at its plant, and not to load, unload, or remove the cars on which the demurrage charges accrued, it was justified in obeying the orders of the sheriff, and is excused for the delay in returning said cars, and should be relieved from the payment of the demurrage charges demanded by the receiver. In support of this proposition counsel cite: Alabama & Vicksburg R. Co. v. Tirelli Brothers, 93 Miss. 797, 48 South. 962, 21 L. R. A. (N. S.) 731, 136 Am. St. Rep. 559, 17 Ann. Cas. 879, in which the carrier was held not liable for damages for failure to deliver a car of fruit, where the municipal authorities were present and prepared to prevent delivery; Southern Express Co. v. Sotille Bros., 134 Ga. 40, 67 S. E. 414, in which a carrier was relieved from liability on account of an interstate shipment of intoxicating liquors in its possession, which had been seized by public officers acting under a warrant issued in conformity to law.

Counsel also cite, to like effect, So. Ry. Co. v. Heymann, 118 Ga. 616, 45 S. E. 491; American Express Co. v. Mullins, 212 U. S. 311, 29 Sup. Ct. 381, 53 L. Ed. 525, 15 Ann. Cas. 536. In their brief counsel quote the following statement from the opinion in Chicago, M. & St. P. R. Co. v. Hoyt, 149 U. S. 1, 13 Sup. Ct. 779, 37 L. Ed. 625:

"But where the event is of such a character that it cannot be reasonably supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words, which, though large enough to include, were not used with reference to, the possibility of the particular contingency which afterwards happens"

—and seem to rely upon it as applicable to the facts in this case. They also cite and quote from the opinion in the case of The Kronprinzessin Cecilie, 244 U. S. 12, 37 Sup. Ct. 490, 61 L. Ed. 960, and, commenting upon this case, they say:

"If the master was justified in turning back to avoid capture, plaintiff in error was justified in its conduct and excused from liability, because, construing the contract with business sense, it cannot be said that the parties contemplated that it would be the duty of plaintiff in error to organize armed resistance to the duly constituted authorities of the state of Kansas, and by force of arms overcome the sheriff and his deputies, and at all hazards and in defiance of the sheriff's orders, proceed to unload the cars, or attempt to do so, and thereby cause the destruction, not only of the property of plaintiff in error, including its plant, but also the property of defendant in error, including the very cars upon which the demurrage is claimed, and, in addition thereto, provoking acts of violence and murder by the members of the mob. It would be extremely unreasonable to say that the parties had in mind, at the time the contract was entered into, that such a contingency might arise, and that plaintiff in error had contracted, under these circumstances, to unload the cars at all hazards."

There are other citations of authorities, with variations of the argument. Doubtless if it had then been decided, counsel would have cited Texas Co. v. Hogarth Shipping Corporation, Ltd., 256 U. S. ——, 41 Sup. Ct. 612, 65 L. Ed. ——, decided by the Supreme Court of the United States June 6, 1921, and would have relied upon it as supporting their contention.

The contention of the plaintiff in error is unsound, because based upon premises inapplicable to the present case. The argument overlooks or ignores the fact that the court below was, as this court is, dealing with an act of Congress which has clearly defined and determined the rights and obligations of the parties in respect to the subject-matter of the action. In Louisville & Nashville Railroad Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, the court, in discussing the acts of Congress regulating commerce, says:

"It may be, as suggested, that a refusal to enforce the agreement of 1871 will operate as a great hardship upon the defendants in error. But that consideration cannot control the determination of this controversy. Our duty is to ascertain the intention of Congress in passing the statute upon which the railroad company relies as prohibitive of the further enforcement of the agreement in suit. That intention is to be gathered from the words of the act, interpreted according to their ordinary acceptation, and, when it becomes necessary to do so, in the light of the circumstances as they existed when the statute was passed. Platt v. Union Pacific R. R. Co., 99 U. S. 48, 64. The court cannot mold a statute simply to meet its views of justice in a particular

case. Having, in the mode indicated, ascertained the will of the legislative department, the statute as enacted must be executed, unless found to be inconsistent with the supreme law of the land. * * * In our opinion, after the passage of the Commerce Act the railroad company could not lawfully accept from Mottley and wife any compensation 'different' in kind from that mentioned in its published schedule of rates. And it cannot be doubted that the rates or charges specified in such schedule were payable only in money. They could not be paid in any other way, without producing the utmost confusion and defeating the policy established by the acts regulating commerce. The evident purpose of Congress was to establish uniform rates for transportation, to give all the same opportunity to know what the rates were, as well as to have the equal benefit of them. To that end the carrier was required to print, post, and file its schedules, and to keep them open to public inspection. No change could be made in the rates embraced by the schedules, except upon notice to the Commission and to the public. But an examination of the schedules would be of no avail, and would not ordinarily be of any practical value, if the published rates could be disregarded in special or particular cases by the acceptance of property of various kinds, and of such value as the parties immediately concerned chose to put upon it, in place of money for the services performed by the carrier. * * * It is now the established rule that a carrier cannot depart to any extent from its published schedule of rates for interstate transportation on file without incurring the penalties of the statute. Union Pac. Ry. Co. v. Goodridge, 149 U. S. 690, 691; Gulf, Col., etc., Ry. Co. v. Hefley, 158 U. S. 98, 102; I. C. C. v. Ches. & Ohio Ry. Co., 200 U. S. 361, 391; Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 439. That rule was established in execution of a public policy which, it seems, Congress deliberately adopted as applicable to the interstate transportation of persons or property."

In the case of Louisville & Nashville R. Co. v. Maxwell, 237 U. S. 94, 35 Sup. Ct. 494, 59 L. Ed. 853, L. R. A. 1915E, 665, the court says:

"Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they, as well as the carrier, must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict, and it obviously may work hardship in some cases. but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination. The act (section 6) provides: 'Nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs.' The scope and effect of the provisions of the statute as to filing tariffs (both in their present form and as they stood prior to the amendments of 1906) have been set forth in numerous decisions. Gulf, Col. & Sante Fé Ry. v. Hefley, 158 U. S. 98; Tex. & Pac. Ry. v. Mugg, 202 U. S. 242; Tex. & Pac. Ry. v. Abilene Cotton Oil Co., 204 U. S. 426, 445; Armour Packing Co. v. United States, 209 U. S. 56, 81; N. Y. C. & H. R. R. v. United States, 212 U. S. 500, 501; Chicago & Alton R. R. v. Kirby, 225 U. S. 155, 166; Illinois Central R. R. v. Henderson Co., 226 U. S. 441; Kansas Southern Ry. v. Carl, 227 U. S. 639, 653; Pennsylvania R. R. v. International Coal Co., 230 U. S. 184, 197; Boston & Maine R. R. v. Hooker, 233 U. S. 97, 110–113; George N. Pierce Co. v. Wells, Fargo & Co., 236 U. S. 278, 284."

In the case of Western Union Telegraph Co. v. Esteve Brothers & Co., 256 U. S. ——, 41 Sup. Ct. 5&4, 65 L. Ed. ——, decided by the Supreme Court of the United States June 1, 1921, the court says:

"The Act of June 18, 1910, c. 309, § 7, 36 Stat. 539, 544 (Comp. St. § 8563), broadened the scope of the Act to Regulate Commerce to include 'telegraph, telephone and cable companies (whether wire or wireless) engaged in sending messages from (a) state * * * to any foreign country.' And whatever may have been the legal incidents of transmitting the message from Barcelona to Havre under Spanish and French law, the Western Union, in sending the message over its own lines from Havre to New Orleans, was governed by the provisions of that act. Galveston, Harrisburg & San Antonio Ry. Co. v. Woodbury, 254 U. S. 357, 41 Sup. Ct. 114, 65 L. Ed. ——. * * * The act of 1910 introduced a new principle into the legal relations of the telegraph companies with their patrons which dominated and modified the principles previously governing them. Before the act the companies had a common-law liability from which they might or might not extricate themselves according to views of policy prevailing in the several states. Thereafter, for all messages sent in interstate or foreign commerce, the outstanding consideration became that of uniformity and equality of rates. Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed. Assent to the terms of the rate was rendered immaterial, because, when the rate is used, dissent is without effect."

And referring to the rule applicable to railroads under the Act Regulating Commerce, the court says:

"It is true that a railroad rate does not have the force of law, unless it is filed with the Commission. But it is not true that out of the filing of the rate grows the rule of law by which the terms of this lawful rate conclude the passenger. The rule does not rest upon the fiction of constructive notice. It flows from the requirement of equality and uniformity of rates laid down in section 3 of the Act to Regulate Commerce (Comp. St. § 8565). Since any deviation from the lawful rate would involve either an undue preference or an unjust discrimination, a rate lawfully established must apply equally to all, whether there is knowledge of it or not. Congress apparently concluded, in the light of discrimination theretofore practiced by railroads among shippers and localities, that in transportation by rail equality could be secured only by provisions involving the utmost definiteness and constant official supervision. Accordingly by section 6 (Comp. St. § 8569) it forbade a carrier of goods from engaging in transportation unless its rates had been filed with the Commission; and it prohibited, under heavy penalties, departure in any way from the terms of those rates when filed."

The Interstate Commerce Commission, in Conference Ruling No. 8, has declared that:

"The Commission has no power to release carriers from the obligation of tariffs providing for demurrage charges, on the ground that such charges have been occasioned by a strike."

In view of the prohibitions of the statute, it is clear that courts are equally without power to release parties from the obligation of tariffs providing for demurrage charges on the ground that such charges have been occasioned by a strike. Congress alone has the power to write such an exception into the statute.

Judgment affirmed.