Matthias, J.
The entire contention of the defendant against the claim of the plaintiff for demur-rage charges, as concisely stated by counsel, is that inasmuch as it is stipulated in the agreed statement of facts that the demurrage charges sought to be recovered were not caused to any degree by “any failure or negligence of the defendant,” and that the bunching of cars was not caused by ‘ ‘ any act or neglect” of the railroad, but “wholly by conditions created by the heavy snowfall, severe storms, and protracted intensely cold weather in the latter part of 1917 and in January and February of 1918, and the confusion and delay of traffic incident thereto, and to the results thereof,” there is no liability on the part of the defendant for any of the demurrage charges sought to be collected.
*332 Under the terms and provisions of the official classification of rates and tariffs of the railroad company duly filed, all cars, such as those involved in this litigation, are subject to the demurrage rules which are a part thereof. The following portions of ■the same are required in the consideration of this case: Forty-eight hours’ free time is allowed within which to unload, which time is to be computed from the first 7 A. M., after actual or constructive placement of cars to be delivered on any other than public delivery tracks, notification to be sent to the consignee within 24 hours after arrival. When cars are consigned or ordered to private tracks or switches, to which delivery cannot be made on account of the inability of the consignee to receive, delivery will be considered to have been made when the cars are tendered. The railroad’s agent must send or give consignee written notice of all cars he has been unable to deliver because of the condition of a private or interchange track. This is considered constructive placement.
The so-called “average agreement” provided for in such tariffs was entered into by the parties to this suit. The agreement provides, among other things, for a method of computation which will be referred to later, and further provides that—
“A consignee who enters into this average agreement shall not be entitled to cancellation or refund of demurrage charges under section A, paragraphs 1 and 3, or section B, of rule 8.”
Under section A no demurrage charges were to be collected for the detention of cars caused by weather conditions making it impossible to employ men or teams in loading or unloading, or in handling freight, *333 or when because of high water or snowdrifts it is impossible to get to cars for loading or unloading during the prescribed free time; and under section B, where the detention was caused by the delivery of cars by the railroad in accumulated numbers in excess of daily shipments, when such accumulation or bunching of cars was the result of the act or neglect of any railroad, the consignee was allowed such free time as he would have been entitled to, had the cars been delivered in accordance with the daily rate of shipment. Under the terms and conditions of this “average agreement,” defendant admittedly waived these exemptions from demurrage charges, to which it would otherwise have been entitled under the provisions of the tariff just referred to. Other exceptions were made in the tariff as to the liability for demurrage charges, none of which is involved in this ease, and therefore need not be considered.
The contention of the plaintiff is that demurrage must be changed for the detention of all cars beyond the free time allowed by such tariffs, unless the same are exempt under one of the specific exceptions stated, and that clearly is the purport and effect of these tariffs filed with the Interstate Commerce Commission, and of the “average agreement” which is a part thereof. It is to be borne in mind that the shipments involved in this proceeding were all interstate, and therefore are ruled and controlled by the rates, charges, and regulations set forth in the schedule of tariffs filed with the Interstate Commerce Commission.
It is settled that the published tariff, so long as in force, has the effect of a statute, and is binding upon the railroad and the shipper alike. The fed *334 eral statutes authorizing such tariffs require that they shall he uniformly applied and enforced. (Pennsylvania Rd. Co. v. International Coal Mining Co., 230 U. S., 184, 33 Sup. Ct., 893, 57 L. Ed., 1446, Ann. Cas. 1915A, 315.) It was there held that if as a fact the rates were unreasonable, the shipper was nevertheless bound to pay and the carrier to retain what had been paid, leaving, however, to the former, the right to apply to the Commission for reparation. A carrier cannot depart to any extent from its published tariff schedules of rates for interstate transportation, on file, without incurring the penalties of the statute. (Louisville & Nashville Rd. Co. v. Mottley, 219 U. S., 467, 31 Sup. Ct., 265, 55 L. Ed., 297, 34 L. R. A. (N. S.), 671.) It was stated by the Supreme Court of the United States, speaking through Justice Hughes, reported in the Minnesota Rate Cases, 230 U. S., 352, at page 419, 33 Sup. Ct., 729, 57 L. Ed., 1511, 48 L. R. A. (N. S.), 1151, Ann. Cas., 1916A, 18, as follows:
“The dominating purpose of the statute was to secure conformity to the prescribed standards through the examination and appreciation of the complex facts of transportation by the body created for that purpose; and, as this court has repeatedly held, it would be destructive of the system of regulation defined by the statute if the court, without the preliminary action of the Commission, were to undertake to pass upon the administrative questions which the statute has primarily confided to it.”
The question here presented is one which would affect materially the uniformity of the operation of railroad tariffs, and particularly demurrage charges. We may here refer to the language of the Interstate *335 Commerce Commission itself, in Davis Sewing Machine Co. v. P., C., C. & St. L. R. Co., 51, Interst. Com. Com’n R., 191, where the Commission says, at page 193:
“Demurrage was and is assessable for detention beyond the free time, except that under the straight demurrage arrangement provision is made for an extension of the free time in case of bunching of shipments through the fault of the carrier, which concession is waived under an average agreement. The rules make no provision for additional free time for car detention on account of bunching resulting from an act of God. Por any departure from those rules defendant [railroad company] would be guilty of a violation of the act. One of the purposes of the average agreement is, by credits for cars promptly released, to take care of detention caused by bunching and weather interference. * * * It would seem to us a strange principle that would permit a carrier to decline, under the average agreement, responsibility for the bunching of cars by its own act or neglect, and at the same time hold it accountable for bunching resulting from no fault of its own.”
In that case the Interstate Commerce Commission reached the conclusion that the charges for detention, which resulted from the bunching of cars after the flood of 1913, lawfully accrued, and they were required to be paid. To the same effect is the holding of the Interstate Commerce Commission in the more recent case of Mt. Hood Rd. Co. v. Director General, as Agent, 60 Interst. Com. Com’n R., 116, where, in referring to the rule of liability applicable, one of the commissioners makes the statement, quite *336 pertinent in the consideration of the instant case, that:
“Having contracted to accept the benefits of the average agreement as contained in defendant’s schedules on file with us, complainant must take it subject to its inherent disadvantages.”
Under the terms of the average agreement, charges for detention of cars are computed upon the basis of the average time of detention of all of such cars unloaded and released during each calendar month, so that the shipper or consignee receives the benefit by way of credit for prompt unloading of cars, and if the credits equal or exceed the debits at the end of the calendar month no charge is made for the detention of cars; and, on the other hand, no payment is to be made to the consignee on account of the excess of such credits. This question was considered somewhat fully by the United States Circuit Court of Appeals in the case of Sinclair Refining Co. v. Schaff, 275 Fed., 769, 21 A. L. R., 1466, where the court held that the rates fixed by tariff schedules filed must be charged and enforced, and the claim that the detention was occasioned by a strike, or was by orders of a sheriff prohibiting the moving of the cars to prevent inciting mob violence, was not a defense to an action to collect such charges. Attention is thereby directed to the fact that the Interstate Commerce Acts of Congress have clearly defined and determined the rights and obligations of the parties in respect to the subject-matter of the action. It there applies the rule clearly stated by the Supreme Court of the United States in Louisville & Nashville Rd. Co. v. Maxwell, 237 U. S., 94, at page 97, 35 Sup. Ct., *337 494, 59 L. Ed., 853, L. R. A., 1915E, 665, that deviation from rates fixed hy schedules duly filed.and promulgated is not permitted upon any pretest, and then states:
“This rule is undeniably strict, and it obviously may work hardship in some cases; but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce, in order to prevent discrimination. ’ ’
In the ease Of Western Union Telegraph Co. v. Esteve Brothers & Co., 256 U. S., 566, at page 573, 41 Sup. Ct., 584, at page 587 (65 L. Ed., 1094), it is said:
“Congress apparently concluded, in the light of discrimination theretofore practiced by railroads among shippers and localities, that in transportation by rail equality could be secured only by provisions involving the utmost definiteness and constant official supervision. Accordingly by Section 6 * * * it prohibited, under heavy penalties, departure in any way from the terms of those rates when filed.”
It was said by Justice Lamar in 230 U. S., supra, at page 196, 33 Sup. Ct., at page 895 (57 L. Ed., 1446, Ann. Cas. 1915A, 315):
“The reasonableness of rates, and the permissible discrimination based upon difference in conditions, are not matters of law. So far as the determination depends upon facts, no jurisdiction to pass upon the administrative questions involved has been conferred upon the courts. That power has been vested in a single body, so as to secure uniformity, and to prevent the varying and sometimes conflicting results that would flow from the different *338 views of the same facts that might be taken by different tribunals.”
It was there held, however, that the court had jurisdiction when there was departure from the published tariff' and exemption allowed a shipper from certain charges where none was permitted by the tariffs on file with the Interstate Commerce Commission.
It is to be observed that the parties to this agreement specifically provided that the extreme and unusual conditions of the weather, which in the tariffs on file exempted the consignee from the payment of demurrage charges, should not, under the “average agreement” entered into, serve to exempt him from those charges, and then provided, evidently in view of the method of the computation of the demurrage charges over the calendar month, as elsewhere referred to, that consignee should not be relieved from paying demurrage charges caused by the bunching of cars, even where that resulted from the negligence of the railroad itself.
•We think it clear that the doctrine of “expressio unius est exclusio alierius” applies, and that, the parties having undertaken to specify the causes which would exempt the consignee from paying demurrage charges, other causes of exemption cannot be read into the tariffs or the contract, particularly such causes as weather conditions, with which the,7 had especially dealt in their written agreement, and this principle must apply, even though the weather conditions were such as to constitute “an act of G-od.” Admittedly in this case one-specific effect of the average agreement signed by the parties was to remove the exception stated in the tariff, under *339 which the consignee would have been exempt from demurrage where bunching of cars had been due to any act or neglect of the railroad company; and therefore by reason of such average agreement demurrage was recoverable, even though the delay in unloading resulted from the bunching of cars, and such bunching of cars was caused by the act or neglect of the railroad company. The claim can scarcely be maintained that it could have been contemplated that the railroad company would be entitled to demurrage, and therefore required to collect it, where its own neglect caused the condition by reason of which the charge accrued, but would not be entitled to charge and collect such demurrage if the bunching of cars and their consequent detention for unloading resulted from conditions over which the railroad company had no control.
The clear purpose of the acts of Congress and of the rules and regulations of the Interstate Commerce Commission, adopted pursuant thereto, to prohibit and prevent preferences and discriminations in behalf of favored shippers, which had long been practiced, could be and probably would be completely thwarted if a railroad company could in specific instances relieve shippers or consignees from charges and rates fixed by the schedules published by filing same with the Interstate Commerce Commission as required by law. A careful consideration and analysis of these tariffs and of the “average agreement” as a part thereof, having in view the purpose and object intended to be accomplished thereby, impel the conclusion that the demurrage charges in question were valid and enforceable against the defendant.
*340 Furthermore, this court follows and applies the principle established and generally recognized that, where a rule has been made by a federal tribunal, duly authorized in the premises, the state courts should follow and give effect to such decision. In the syllabus in the case of Swift & Co. v. Hocking Valley R. Co., 93 Ohio St., 143, 112 N. E., 212, L. R. A., 1917E, 916, this court held the following:
“Where a demurrage rule, named in the tariff filed by an interstate railroad with the Interstate Commerce Commission and published according to law, has been passed upon and approved by the Commission, acting within the scope of its authority, the decision of that tribunal is binding upon the state courts, and the question of the validity of the rule is not open for consideration in an action brought by the railroad company to recover the charges assessed under the rule as to cars engaged in interstate commerce.”
To the same effect was the holding of this court in the case of Cleveland & Western Coal Co., v. Pennsylvania Co., 97 Ohio St., 161, where on page 163 of the opinion (119 N. E., 367) are cited Tex. & Pac. R. Co., v. American Tie & Timber Co., 234 U. S., 138, 34 Sup. Ct., 885, 58 L, Ed., 1255, and Tex. & Pac. R. Co. v. Abilene Cotton Oil Co., 204 U. S., 426, 27 Sup. Ct., 350, 51 L. Ed., 553, 9 Ann. Cas., 1075, as authority for the proposition that uniform rules and uniform construction of rules are essential to secure the object sought and to prevent the confusion which would result from one rule held in one jurisdiction and another rule in another jurisdiction, and hence that courts may not as an original question exert authority over subjects which primarily come with *341 in the jurisdiction of the Interstate Commerce Commission.
The question here involved having been definitely determined by the Interstate Commerce Commission, acting within the scope of its authority conferred by the acts of Congress, such determination is binding and conclusive, not only upon the parties, but upon the state courts, and for that reason also the judgment of the Court of Appeals is affirmed.

Judgment affirmed.

Bobinson, Jones and Day, JJ., concur.