JAMES C. DAVIS, Agent of the United States Government, Appellee, *vs.* THE KEYSTONE STEEL AND WIRE COMPANY, Appellant.

*Opinion filed April 24, 1925—Rehearing denied June 11, 1925.*

1. PUBLIC UTILITIES—*owner of property devoted to a public use must submit to regulations.* The owner of property devoted to a public use must submit to the regulation thereof for the common good so long as he continues the use, but regulations cannot compel the doing of services without reward or the taking of private property for public use without just compensation or due process of law.

2. SAME—*courts cannot interfere with rate fixed by legislative authority.* Where the maximum charge or rate for the service of a public utility has been fixed by legislative authority, the court has nothing to do with the question unless the law-making power has attempted to force the owner to use his property for public benefit without just compensation.

3. RAILROADS—*what is included in term "transportation," as defined in Hepburn act.* The term "transportation," as defined in the act of Congress known as the Hepburn act, includes cars and other vehicles and all instrumentalities and facilities of shipment or carriage and all services in connection with the receipt, delivery, transfer, storage and handling of property in transit, including the retention of cars unloaded beyond the free time allowed by the demurrage rule, irrespective of ownership or contract.

4. SAME—*demurrage charges are proper part of schedule required to be filed.* Demurrage charges stand upon the same footing as any other charge made by a carrier in connection with the transportation of property and are a part of the schedule required to be filed with the Interstate Commerce Commission, as

such charges are for a portion of the transportation service for which the carrier has no right to charge, demand, collect or receive a greater or less or different compensation than that specified.

5. SAME—*parties cannot by agreement alter any part of contract of transportation.* Parties cannot by agreement alter in any particular the terms of the contract of transportation of a public carrier, including every form of instrumentality or facility of shipment or carriage, irrespective of ownership, or of any contract in the care, handling and storage of the property transported, from the time the car is delivered to the consignor for loading until it is returned empty by the consignee.

6. SAME—*schedule of rates is binding on both carrier and shipper.* The schedule of an interstate carrier, which is required to be filed with the Interstate Commerce Commission, is binding as a statute upon both the carrier and shipper, and no agreement of the parties can modify the terms of such schedule or authorize the collection by the carrier of less than the schedule rate.

7. SAME—*approval of schedule is conclusive that rates are reasonable.* The fixing of rates by the Interstate Commerce Commission by approval of the schedule of an interstate carrier establishes that the rates are reasonable and not discriminatory.

8. SAME—*fixing of rates of public carriers does not violate due process of law.* The fixing or establishing of rates of an interstate carrier by the Interstate Commerce Commission is not such an interference with freedom of contract as amounts to an unconstitutional deprivation of property without due process of law, as Congress has the right to regulate commerce between the States, and as incident thereto power to enact legislation for the prevention of unreasonable extortion and unjust discriminations.

9. SAME—*when a carrier must collect demurrage charge notwithstanding strike.* An interstate carrier must collect demurrage charges in accordance with its schedule filed with the Interstate Commerce Commission even though the demurrage accrued on account of the cars being delivered to the consignee at the time of a strike of its employees, rendering it unable to unload the cars in the free time allowed; and where the railroad company at the time was operating under the Federal Control act it is immaterial whether the demurrage accrued on interstate or intrastate shipment.

10. CONTRACTS—*all contracts are subject to the possibility that they may become illegal.* All contracts are subject to the possibility that they may, by the exercise of its constitutional power by the legislative authority when the public interest demands it, become illegal.

APPEAL from the Circuit Court of Peoria county; the Hon. CHARLES V. MILES, Judge, presiding.

TICHENOR, TODD, WILSON & BARNETT, for appellant.

MILLER, ELLIOTT & WESTERVELT, (BARNES, MAGOON & HORTON, of counsel,) for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

The defendant, the Keystone Steel and Wire Company, claiming that by a judgment rendered against it by the circuit court of Peoria county in favor of James C. Davis, agent of the United States under the provisions of the Transportation act of 1920, for $18,930, demurrage on certain cars delivered to defendant between August 5 and October 10, 1919, it has been deprived of its property without due process of law, in violation of the constitutions of the State of Illinois and of the United States, has appealed to this court.

The cause was heard by the court without a jury upon the plea of the general issue and stipulation that any evidence showing a defense might be offered. The defense made by the evidence was, that on July 5, 1919, a strike of the defendant's employees was called, which, because of threats and intimidation, resulted on August 13 in depriving it of all of its employees, who usually numbered between four and six hundred men, except the office employees and from fifty to seventy-five employees in the plant. On August 13 it undertook to increase its working force, but its efforts were frustrated by a mob, which by violence drove out its employees and took possession of its plant. The defendant sought protection from the sheriff and the State but received none, and finally regained possession of its plant on October 2 by the assistance of the United States marshal acting under a restraining order issued by the

Federal district court. From August 13 to October 2 the defendant was prevented from unloading the cars delivered to it except one car, which was unloaded on September 26. The demurrage charges which accrued to October 2 amounted to $16,830. On October 3 the unloading of cars began and continued until October 17. During this time the demurrage charges accumulated to the amount of $2100. The unloading was accomplished as fast as the defendant could get the men to do it.

Propositions of law were submitted to the court by the parties, and the court held, in substance, that it was the duty of the appellee to collect the demurrage charges in accordance with the tariffs in force and on file with the Interstate Commerce Commission and the Illinois Public Utilities Commission; that the defendant was bound to pay such charges even though it had been prevented from unloading the cars by reason of a strike of its employees, and that a strike where the strikers and mob took possession of the defendant's plant and by threats and acts of violence and intimidation prevented it from carrying on its business and unloading cars delivered to it did not relieve it from this liability. The contention of the appellant is that the duty to pay demurrage charges is one imposed by law and is in the nature of a penalty not arising from any contract, and that the failure to admit its defense deprived it of its property without due process of law, and its whole argument is based on that proposition.

The charges of common carriers, keepers of ferries, wharfingers, inn-keepers, hackmen, and others whose business is affected with a public interest, have from time immemorial been subject to regulation by law and the rates to be charged for their services have been fixed by statute. The owner of property which he has devoted to a use in which the whole public has a direct interest must submit to the regulation for the common good so long as he exercises the use. The public has a direct interest in all these

occupations, for they are necessary to the public convenience and welfare. Everyone has a right to make use of the services and enjoy the accommodations of those who are engaged in these employments, and everyone is at times obliged to have the use of some of them. At common law persons engaged in these employments were allowed to charge such prices as they could agree upon with those dealing with them but not entirely at their own will. The rule was recognized that the charges for their services and accommodations must be reasonable and not arbitrary and excessive. This rule was the regulation at common law of rates charged for service. As to carriers it was early amended in England by statute (3 W. & M. chap. 12, sec. 24,) fixing rates, and following a preamble reciting: "Whereas, divers wagoners and other carriers by combination amongst themselves have raised the prices of carriage of goods in many places to excessive rates, to the great injury of the trade, be it therefore enacted," etc. An act of the General Assembly of Illinois approved April 25, 1871, fixed the maximum rate to be charged for the storage of grain in warehouses. An information for violation of the act was filed in the criminal court of Cook county, and the defendants being convicted prosecuted a writ of error from this court, insisting that the statute violated the constitutional prohibitions against deprivation of liberty or property without due process of law and against the taking of private property for public use without just compensation. The judgment was affirmed, the court holding that a law providing a maximum rate of charges did not violate either of the constitutional provisions in question. (*Munn* v. *People,* 69 Ill. 80.) The case was then taken to the Supreme Court of the United States, which affirmed the judgment, holding that the statute did not violate the fourteenth amendment of the Federal constitution or any other provision of that instrument, and that the fixing of maximum rates is a legislative function. (*Munn* v. *Illinois,* 94 U. S.

113.)   In *Budd* v. *New York,* 143 U. S. 517, the constitutionality of a somewhat similar statute of the State of New York, governed by the same principle, was sustained, the court citing numerous cases as recognizing the doctrine of the *Munn case* that the legislature may fix a maximum fee, beyond which any fee would be unreasonable, in respect to services rendered in a public employment or for the use of property in which the public has an interest, but cannot compel the doing of services without reward or taking private property for public use without just compensation or due process of law.   Where the maximum charge has been fixed by legislative authority the court has nothing to do with the question unless the law-making power has attempted to force the owner to use his property for public benefit without just compensation.

Moved by combinations and practices similar to those recited in the preamble to the statute of 3 W. & M. two hundred years before, which has been referred to, and by other practices and devices resulting not only in excessive rates but also in unjust discrimination between individuals and communities, Congress passed the act of February 4, 1887, to regulate commerce, known as the Interstate Commerce act, for the purpose of preventing interstate railroad carriers from charging unreasonable rates and from unjustly discriminating between persons and localities.   (*New York, New Haven and Hartford Railroad Co.* v. *Interstate Commerce Com.* 200 U. S. 361.)   The railroads availed themselves of the weakness and cumbrous machinery of the original law to defeat its purpose, and this led to various amendments strictly defining and limiting the duties and powers of the carriers, and giving authority to the Interstate Commerce Commission for effective action to secure the observance of the law by the establishment and enforcement of reasonable, uniform rates, without discrimination between persons and localities.   *Railroad Com.* v. *Chicago, Burlington and Quincy Railroad Co.* 257 U. S. 563.

The act of June 29, 1906, known as the Hepburn act, amended section 6 of the Interstate Commerce act so that paragraph 7 of that section provides as follows: "No carrier, unless otherwise provided by this Act, shall engage or participate in the transportation of passengers or property, as defined in this Act, unless the rates, fares and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this Act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs: Provided, That wherever the word 'carrier' occurs in this Act it shall be held to mean 'common carrier.' " (Comp. Stat. 1916, sec. 8569, par. 7.)

An act of Congress of August 29, 1916, gave the President in time of war power to take possession and control of any system of transportation and use it to the exclusion of all other traffic, so far as necessary for the transportation of troops, war material and equipment or such other purposes connected with the emergency as might be necessary or desirable. (Comp. Stat. 1916, sec. 1974a.) War with Germany was declared on April 6 and with Austria on December 7, 1917, and on December 26 the President issued a proclamation taking control of the transportation systems of the country and appointing a director general with authority to operate and manage them, using the services of the agents and employees then engaged in such operation and management.

On March 21, 1918, the Federal Control act was enacted by Congress, section 10 of which provided, among other things: "During the period of Federal control, whenever in his opinion the public interest requires, the President may initiate rates, fares, charges, classifications, regulations, and practices by filing the same with the Interstate Commerce Commission, which said rates, fares, charges, classifications, regulations and practices shall not be suspended by the commission pending final determination.

"Said rates, fares, charges, classifications, regulations, and practices shall be reasonable and just and shall take effect at such time and upon such notice as he may direct, but the Interstate Commerce Commission shall, upon complaint, enter upon a hearing concerning the justness and reasonableness of so much of any order of the President as establishes or changes any rate, fare, charge, classification, regulation, or practice of any carrier under Federal control, and may consider all the facts and circumstances existing at the time of the making of the same.  In determining any question concerning any such rates, fares, charges, classifications, regulations, or practices or changes therein, the Interstate Commerce Commission shall give due consideration to the fact that the transportation systems are being operated under a unified and coordinated national control and not in competition."  (Comp. Stat. 1919. sec. 3115-3/4j.)

Under the authority of this section 10 demurrage rates were initiated by the President, through the Director General of Railroads, by rules which were filed with the Interstate Commerce Commission and the Illinois Public Utilities Commission, and by the stipulation of the parties were applicable to any charges for demurrage during the times for which demurrage is claimed in this case.  These rules provided that all cars, with certain exceptions not material here, should be subject to them which were held for or by consignors or consignees for loading, unloading, forward-

ing directions, or for any other purpose, forty-eight hours, two days' free time to be allowed for loading or unloading of all commodities, and after the expiration of the free time allowed, charges would be made for each car of $3 for each of the first four days, $6 for each of the next three days and $10 for each succeeding day. There were rules in regard to Sundays, holidays, the manner of computing time, delivery of cars, and other matters not material to state because they do not affect the controversy. Rule 9 authorized what is called the average agreement which consignors and carriers might make as a basis for determining demurrage by a different rule, which is not material since the amount of the charge is not in controversy if the appellant is liable for the demurrage rate fixed by the rule filed.

The term "transportation," as defined in the Hepburn act, includes cars and other vehicles and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation and transfer in transit, ventilation, refrigeration or icing, storage and handling of property transported; and that act makes it the duty of every carrier subject to its provisions to provide and furnish such transportation upon reasonable request therefor and to establish through routes and just and reasonable rates applicable thereto. This act clearly declared the intention of Congress to impose a duty upon carriers in respect to furnishing cars for interstate traffic, and this assertion of its authority by Congress excluded the power of the State over the subject matter. (*Chicago, Rock Island and Pacific Railway Co. v. Hardwick Farmers Elevator Co.* 226 U. S. 426.) The charge for demurrage stands upon the same footing as any other charge made by a carrier in connection with the transportation of property and was properly included in the schedule required to be filed with the Interstate Commerce Commission and published. (*Swift & Co. v. Hocking Val-*

*ley Railway Co.* 93 Ohio St. 143; affirmed in 243 U. S. 281.) The retention of cars unloaded beyond the free time allowed by the demurrage rule is a terminal service forming a part of the transportation as defined in the act of Congress. It is a facility of shipment or carriage in the storage and handling of property transported provided for in the schedule of rates filed and published, for which the carrier has no right to charge, demand, collect or receive a greater or less or different compensation than that so specified. The parties cannot by agreement alter in any particular the terms of the contract of transportation, including every form of instrumentality or facility of shipment or carriage, irrespective of ownership, or of any contract in the care, handling and storage of the property transported, from the time the car is delivered to the consignor for loading until it is returned empty by the consignee. The principle was applied in *Southern Railway Co.* v. *Prescott,* 240 U. S. 632, and in *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* v. *Dettlebach,* 239 id. 588, in holding that the parties to an interstate shipment may not by special agreement alter the conditions specified in the bill of lading in conformity with the carrier's published regulations governing the carrier's liability when a shipment is not removed within forty-eight hours after notice to the consignee of its arrival. The schedule containing the terms upon which the service of transportation was rendered was binding upon both carrier and shipper and must be treated as though it were a statute. *Pennsylvania Railroad Co.* v. *International Coal Mining Co.* 230 U. S. 184; *Swift & Co.* v. *Hocking Valley Railway Co. supra.*

The power given to Congress by the constitution to regulate commerce amongst the several States is complete in itself, and as an incident of that power Congress may adopt not only such means as are necessary but such as are convenient to the exercise of it, and such means may have the qualities of police regulations. (*Hoke* v. *United States, 227*

U. S. 308.) So Congress, for the correction of the abuses of extortion and favoritism before mentioned, made substantial changes in the relations existing between carriers engaged in interstate commerce and shippers, which have materially limited the freedom of contract between them which originally existed. The terms of every contract of shipment, so far as the service to be rendered and the compensation to be received are concerned, are fixed by the schedule filed with and approved by the Interstate Commerce Commission. No agreement of the parties can modify these terms, though expressed in writing and actually performed. The collection by the carrier of less than the schedule rate, though expressly agreed on, will not prevent the recovery of the shortage from the schedule rate. The rates defined by the tariff cannot be varied or enlarged by either contract or tort by the carrier. (*Texas and Pacific Railroad Co.* v. *Mugg,* 202 U. S. 242; *Chicago and Alton Railroad Co.* v. *Kirby,* 225 id. 155; *Louisville and Nashville Railroad Co.* v. *Maxwell,* 237 id. 94; *Keogh* v. *Chicago and Northwestern Railway Co.* 260 id. 156.) "This stringent rule prevails," it is said in the case last cited, "because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated." The fixing of rates by the Interstate Commerce Commission establishes that they are reasonable and not discriminatory. (*Keogh* v. *Chicago and Northwestern Railway Co. supra; Interstate Commerce Com.* v. *Atchison, Topeka and Santa Fe Railway Co.* 234 U. S. 294.) Such interference with the freedom of contract is not an unconstitutional interference with the liberty of the citizen to make contracts or an unconstitutional deprivation of his property without due process of law. Congress has the right to regulate commerce between the States. It is a proper exercise of this power in order to prevent unreasonable extortion and discriminating rates and discriminations in the rendition of service and in preferences to persons or locali-

ties, to prescribe the terms on which the services of carriers in connection with interstate transportation may be rendered, the nature of those services, the compensation for them and the character of the contract between the carrier and the shipper. Even existing contracts in regard to special rates, rebates or for free transportation in consideration of an executed consideration, though valid at the time of the going into effect of the act, after that time were invalid and could not be enforced, for the reason that all contracts are subject to the possibility that they may, by the exercise of its constitutional power by the legislative authority when the public interest demands it, become illegal. *Hoke* v. *United States, supra; Louisville and Nashville Railroad Co.* v. *Mottley,* 219 U. S. 467; *Hite* v. *Cincinnati, Indianapolis and Western Railroad Co.* 284 Ill. 297; *Bullard* v. *Northern Pacific Railroad Co.* 10 Mont. 168.

Since the demurrage was a proper terminal charge, for which the appellant was liable as a part of the transportation of the cars, it was payable by the appellant in accordance with the demurrage rules and the average agreement, and it was the duty of the appellee to collect it unless the existence of the strike excused the payment. The rules make some exceptions to demurrage charges, such as in case of certain weather conditions, delay or irregularity of the carrier in delivery resulting in the bunching of cars, errors in notices or other railroad errors, none of which apply to the circumstances of this case, but no mention is made of failure to load or unload because of a strike. The duty of the consignee to unload is positive. Certain exceptions are stated. The duty to unload is therefore absolute in the absence of the expressed exceptions. The appellant claims that the delay was without its fault, that the charge is in the nature of a penalty imposed by law, that it had no voice in the making of the rules, and that the construction of the rules which denies any defense not provided for in the rules is a violation of the constitutional prohibition of

317—19

the deprivation of property without due process of law. It is true that the rules and rates of demurrage were established by the schedule filed with the Interstate Commerce Commission and approved by it, and the defendant had no more to do with making them than with making the other charges constituting the whole charge for transportation. The demurrage was a part of the charge for transportation. The approval of the schedule by the commission is conclusive that the charge was reasonable. The liability of the appellant must be determined according to the terms of the contract which by the acts of the parties under the act of Congress was entered into. It was the contract of the parties though its terms were prescribed by Congress under its power to regulate commerce between the States, and in so doing to interfere with the right of private contract when the public interest in interstate transportation demands it. That contract did not excuse the appellant from liability for demurrage because of interference with its business by a strike.

In the case of *Sinclair Refining Co.* v. *Schaff,* 275 Fed. 769, the question whether a strike in the plant of the shipper which prevented him from moving cars, and the order of the sheriff forbidding any attempt to move them on account of the strike, would relieve the shipper from liability for demurrage charges, was presented. The facts in the case were very similar to the facts in the present case. The United States circuit court of appeals for the eighth circuit affirmed the judgment against the defendant, referring in its opinion to the holding of the Interstate Commerce Commission in Conference Ruling No. 8, declaring that "the commission has no power to release carriers from the obligation of tariffs providing for demurrage charges on the ground that such charges had been occasioned by a strike," and concluding: "In view of the prohibitions of the statute it is clear that courts are equally without power to release parties from the obligation of tariffs providing for

demurrage charges on the ground that such charges have been occasioned by a strike. Congress alone has the power to write such an exception into the statute."

In *Southern Railway Co.* v. *White,* 284 Fed. 560, the United States circuit court of appeals for the sixth circuit held that a shipper who was prevented from returning cars within the time fixed by the demurrage rules for loading because of the destruction of a bridge caused by an unprecedented storm, between the loading point of his logging railroad and the connection with the railway from which the cars were received, was relieved from demurrage while the impossibility of returning the cars continued. This was on the ground that the storm was of such extraordinary character and violence that the destruction of the bridge should be regarded as an act of God, the court saying: "We think it is a safe statement of the general rule to say that when a duty is imposed by law and its performance becomes impossible because of an act of God, there can be no recovery of damages for the breach." Whether this decision was right or not, it is not applicable to this case.

The demurrage accrued on account of cars delivered by the Peoria and Pekin Union Railroad Company and the Peoria Railway Terminal Company during the war, while the railroads were being operated by the Director General of Railroads under the proclamation of the President and the provisions of the Federal Control act. It is immaterial whether the demurrage accrued on interstate or intrastate shipments, because authority to enforce intrastate rates as well as interstate rates was conferred on the President by the act of Congress of August 29, 1916, and the act of March 21, 1918,—the Federal Control act.

The judgment will be affirmed.    *Judgment affirmed.*