SCANDRETT and others, Trustees, Respondents, vs. WORDEN-ALLEN COMPANY, Appellant.

THOMSON, Trustee, Respondent, vs. SAME, Appellant.

*May 20—June 25, 1941.*

274

276

For the appellant there were briefs by *Lecher, Michael, Whyte & Spohn,* attorneys, and *Daniel K. Hopkinson* of

counsel, all of Milwaukee, and oral argument by *Malcolm K. Whyte*.

For the respondents there was a brief by *Rodger M. Trump*, attorney for the Chicago, Milwaukee, St. Paul & Pacific Railroad Company, and by *J. F. Baker* and *Llewellyn Cole*, attorneys for the Chicago & North Western Railway Company, all of Milwaukee, and oral argument by *Mr. Trump* and *Mr. Cole*.

WICKHEM, J.  Defendant contends that the court erred in holding, (1) that the placement and removal of the cars were prevented by a cause attributable to Worden-Allen; (2) that the cars were detained by it; (3) that plaintiffs made every effort in good faith to place and remove the cars; and (4) that plaintiffs fully performed the duty imposed upon them by the terms of the demurrage tariff.  As we view this case it depends upon the construction to be given to the applicable tariffs and the relation of the facts, which are largely conceded, to those tariffs.

Freight Tariff 4-N, effective September 1, 1933, contains the following provisions:

*Rule 1, Section A:*  "Cars . . . held for or by consignors or consignees for loading, unloading, forwarding directions or for any other purpose . . . are subject to these demurrage rules. . . ."

*Rule 6, Section B:*  "When empty cars placed on orders are not used in transportation service, demurrage will be charged from actual or constructive placement until released, with no free time allowance."

*Rule 1, Section B, Note 1:*  "A private track is a track outside of carrier's right of way, yard and terminals, and of which the carrier does not own either rails, ties, roadbed or right of way; or a track or portion of a track which is devoted to the purpose of its user, either by lease or written agreement, in which case the lease or written agreement will be considered as equivalent to ownership."

*Rule 3, Section D, Note 1:* " 'Actual placement' is made when a car is placed in an accessible position for loading or unloading or at a point previously designated by the . . . consignee. If such placing is prevented from any cause attributable to consignor or consignee and car is placed on the private or other-than-public-delivery track serving the . . . consignee, it shall be considered constructively placed, without notice."

*Rule 3, Section D, Note 2:* "Any railroad track or portion thereof assigned for individual use will be treated as 'other-than-public-delivery track.' "

Plaintiffs contend that they were prevented from making actual placement of incoming cars by a cause attributable to defendant; that having placed these cars on the private track serving defendant's plant, that amounted under the circumstances to a constructive placement as defined by Rule 3, Section D, Note 1, of the tariff, released them from further obligation to make actual delivery, and rendered defendant liable for demurrage as though there had been an actual spotting and placing of the cars. It is, of course, conceded that the nine loaded cars involved in the demurrage charges were not spotted by plaintiffs at available places for unloading. With respect to four empty cars which were delivered at available places for loading and promptly loaded, plaintiffs did not enter the premises to remove them and these cars remained at the loading points until the termination of the strike referred to in the statement of facts and then were unloaded and returned empty to the carrier. Plaintiffs claim that since these cars were not released by defendant during the period of the strike, defendant is liable for demurrage under Rule 1, Section A, and Rule 6, Section B, of the applicable tariff. A large portion of the briefs is devoted to a discussion of the question whether the strike of Worden-Allen employees was a cause effective to prevent placing or removal of the cars, and, if so, whether it was a cause attributable to the consignee. It is earnestly contended by defendant that the strike

and particularly the violent manifestations of it which prevented entrance to the plant were not attributable to Worden-Allen and that therefore there was no constructive placing under the tariff. In *Sinclair Refining Co. v. Schaff* (8th Cir.), 275 Fed. 769, and *Davis v. Keystone Steel & Wire Co.* 317 Ill. 278, 148 N. E. 47, it was held that interference with the business of a consignee by strike does not excuse it from liability for demurrage. Doubtless these cases are not strictly in point. They probably do no more than hold that the existence of a strike neither avoids nor imposes a liability for demurrage. In other words, a strike is not an excuse to the consignee for failure to make available the cars to the railroad under penalty of paying demurrage.

In *Chrysler Corp. v. New York Central Ry.* 234 I. C. C. 755, it was held that empty cars in a strike-locked plant had not been made available to the railroads in such a way as to prevent demurrage and that even an actual release of these empty cars is not accomplished until the carriers have been afforded a real and effectual opportunity to remove the cars from the plant.

It is asserted by defendant that this case cannot be considered an authority since the determination is by an administrative body and not by a court. Assuming without deciding that this is true, the determination is certainly entitled to weight as an administrative construction of the tariff by the very commission to which is committed complete regulation of such tariffs. However, we recognize that the question whether a strike by employees of the consignee attended with such violence as to make it impossible for the railroad to place cars or remove released cars "is a cause attributable to the consignee" presents substantial difficulties of solution and can give rise to reasonable differences of opinion. It is not a point upon which there are satisfactory legal authorities, and since in the view that we take of the case it is unnecessary to decide it, we shall not attempt a solution. We con-

sider that under the tariffs in force which are within the Interstate Commerce Act and required to be carried out by the parties, irrespective of private agreements, defendant was liable for demurrage. With respect to incoming cars placed upon the private tracks of defendant but not spotted at unloading points, we think it plain that there was a ·constructive placement for the reason that no placement orders were ever given to the railroad. When violent interference by strikers with the switching operations of the railroad occurred, involving, by the way, cars concerning which no claim for demurrage is made here, the railroad men were instructed by representatives of the defendant that they would be called when futher services were required. There were never during the period of the strike any directions to plaintiff as to the placing of these cars. Neither was there any release to plaintiffs of cars which had been actually placed and loaded. Until this release by defendant, these cars must be considered, under Rule 1, Section A, to have been held by defendant and to be subject under that tariff to demurrage rules. This tariff is explicit and broad. It applies demurrage rules to cars held for loading, unloading, forwarding directions, *or for any other purpose,* and we think this plainly applies to the cars which were ready for return to plaintiffs. Further than this, Rule 6, Section B, specifically provides for demurrage upon empty cars from the time of actual placement until release. As to the incoming cars already placed upon the private tracks of defendant, the failure of defendant to give instructions as to where to spot the cars for unloading made it manifestly impossible for plaintiffs to conduct·further switching operations, and this cause was certainly attributable to defendant. Under these conditions, Rule 3, Section D, Note 1, makes the placement upon the private tracks a constructive placement of the cars and renders the consignee liable for demurrage. The fact that defendant thought it unwise to request further switching of incoming cars or to release cars already loaded

because of the danger of strike violence or its want of control over the territory of its plant is immaterial. Under the cases heretofore cited the strike is not an excuse for defendant's failure in these respects. The important thing is that under the tariffs there could be no release from demurrage charges until the empty cars were released to the railroad and that there was a constructive placement of the other cars in the absence of definite directions for placing. This established the right to demurrage under tariffs which are binding not merely as contracts between the parties but as rules of law governing shipments in interstate commerce.

It is suggested that by a custom which had been long honored and carried out by the parties it was the practice for the railroad to send a switch engine into defendant's plant each day to get directions for the further placing of cars which had already been put upon defendant's private tracks, and that in this case the railroad during the period of the strike did not send its switch engine down for the usual directions. We are of the view that such a custom is ineffective to change the rights and duties of the parties under the tariffs. Even if this were not so, it appears by evidence which the court believed and which was sufficient to sustain a finding to that effect that plaintiffs were told that further switching operations need not be attempted until notification or request by defendant. This would obviate whatever effect such a custom might have on legal assumptions most favorable to defendant because postponement of the switching meant also postponement of specific directions for placing which were by the custom conditions precedent to an obligation further to place or spot cars. It is unnecessary to decide what would have been the legal consequence had defendant released its outgoing cars or given specific directions as to placing of the incoming cars. In that case we would have to decide whether the violence attending the Worden-Allen strike and making entry to its premises and switching operations thereon dan-

gerous or impossible would be a "cause attributable" to Worden-Allen. Under the facts that determination is unnecessary, and we express no opinion upon the matter.

By the Court.—Judgments affirmed.

MARTIN, J. (dissenting). It is obvious that the strike of the defendant's employees, which was in progress from August 5 until November 1, 1934, caused the delay in the switching and placement of all the cars on which demurrage is claimed. As I read the stipulated facts and the freight tariff rules and regulations, it is necessary to determine whether the strike which caused the delay was attributable to the defendant company. It is conceded that Rule 3, Section D, Note 1, only permits cars to be constructively placed when actual placement is prevented by a cause attributable to consignor or consignee. The majority opinion does not determine whether the strike was attributable to the Worden-Allen Company. The trial court found as a conclusion of law that "the switching or placement of the said cars was prevented by the acts of the defendant's employees who were on strike, which was a cause attributable to the defendant, as consignor or consignee within the terms of the said demurrage tariff." The railroad companies contend that they were prevented from making actual placement of the cars by a cause attributable to the consignee, the defendant company, from performing switching services and, that having placed the cars on the private tracks serving defendant's plant, that that amounted to constructive placement within the provisions of the tariff and released them from further obligation to make actual delivery. It is conceded that the nine loaded cars were not delivered to the defendant company at available places for unloading. The four empty cars were delivered at available places for loading and were promptly loaded. But, because the carrier was unable to enter the premises and remove them, these four cars remained at the loading points until the ter-

mination of the strike, and they were then returned to the carrier empty. Thus we have the situation here, where in the case of each of the two groups of cars, the carrier in question was unable to carry out its part of the agreement because of an impossibility. It is the duty of the carrier to place cars at proper and convenient places for loading and unloading; such placement is a condition precedent to the right to charge demurrage.

In 13 C. J. S. p. 799, § 340, it is stated:

"Inasmuch as the primary duty of a carrier in carrying goods includes delivery of the goods to the proper person, as shown, *supra,* § 160, it is generally not entitled to charge demurrage on cars until it has made a proper and sufficient delivery thereof, unless the delivery is not completed because of the fault of the other party or his agent. If the other party is not at fault or in some way responsible therefor, the duty to make a sufficient delivery is not avoided or dispensed with because such delivery has become impossible due to the insufficiency of the carrier's trackage, or because of conditions beyond the carrier's control and for which it is in no way responsible."

In 9 Am Jur. p. 783, § 603, it is stated:

"The right of a carrier to exact demurrage for the detention of cars is dependent upon the proper performance of its duty with respect to the placement of such cars, and default on the part of the shipper or consignee in the performance of his duty with respect to loading or unloading. . . ."

To the same effect see *New York, N. H. & H. R. Co. v. Porter,* 220 Mass. 547, 108 N. E. 499; *Chicago, R. I. & P. Ry. Co. v. State,* 77 Okla. 63, 186 Pac. 234; *Hines v. Thomasville Light & Power Co.* 206 Ala. 420, 90 So. 316; *Chesapeake & Ohio Ry. Co. v. P. T. Board,* 100 W. Va. 222, 130 S. E. 524, 44 A. L. R. 826; *Oregon-Washington R. & N. Co. v. McGoldbrick L. Co.* 119 Wash. 119, 204 Pac. 1059.

In the latter case, it was customary for the carrier to deliver cars loaded with logs at a point on the lumber com-

pany's spur track where the logs could be unloaded into the lumber company's millpond. The carrier moved eight loaded cars onto the lumber company's spur track, but did not spot them at the proper places for unloading. On the day the cars were so placed, a flood occurred which made it impossible for the railroad to move the cars. Subsequently the carrier brought in twenty-two additional cars, but was unable to spot them at the unloading place for the same reason. The court held that the carrier had not delivered any of the cars to the lumber company and was not entitled to demurrage.

The majority opinion states: "We consider that under the tariffs in force which are within the Interstate Commerce Act and required to be carried out by the parties, irrespective of private agreements, defendant was liable for demurrage. With respect to incoming cars placed upon the private tracks of defendant but not spotted at unloading points, we think it plain that there was a constructive placement for the reason that no placement orders were ever given to the railroad." In connection with the futile attempt of the carrier's switching crew to enter defendant's premises on August 10th, the court found that it was then agreed between the carrier's yardmaster and defendant's traffic manager, that no further attempts should be made on behalf of the plaintiffs or either of them, to enter the premises until requested to do so by the defendant company through its traffic manager. The defendant company had no control over its employees or their sympathizers who successfully resisted the switching crew's entrance to defendant's plant on August 10th. All that happened on that day took place outside defendant's premises and on the right of way of the railroad company. The failure of the switching crew to pass the picket line which held forth on the carrier's right of way is not a cause attributable to the defendant. The defendant company was at all times ready, willing, and able to load or unload the cars. The defendant company had no control over the carrier's switching crew.

The plaintiffs were the judges of the effort to be made to reach and enter the defendant's premises. Their effort of August 10th may have been feeble, but they concluded that the resistance of the strikers and their sympathizers excused them from making further effort.

It is conceded that all loading and unloading operations are performed by mechanical means at defendant's plant, and only such cars as are properly placed, can be loaded or unloaded. With the exception of the period of the strike, a switching crew and engine were assigned to defendant's plant each morning of every working day of the year. This was done without waiting for specific daily requests. Upon arriving on the company's premises, the crew was given instructions as to the switching services to be performed, and it then proceeded with the moving and spotting of cars. The majority opinion holds that as to the nine loaded cars the carrier is excused from making actual placement at unloading points because no placement orders as to those nine cars were ever given to the railroad. The fact is that the carrier's switching crew and engine never came onto the defendant's premises to receive switching orders after August 10th, until October 29th, when, with the assistance of a number of policemen, the switching crew entered defendant's premises and removed certain cars which are not involved in either claim for demurrage. These cars were loaded with material for a government order at Fountain City.

The point is stressed in the majority opinion that on August 10th the defendant's traffic manager told the carrier's yardmaster that no further attempt need be made on behalf of the plaintiffs, or either of them, to enter the defendant's premises to render switching services until requested to do so by defendant company through its traffic manager. Before this alleged statement was made by defendant's traffic manager, the carrier's switching crew had already determined that it could not get through the picket line and

that further efforts to reach and enter defendant's premises would be futile. There is nothing in the stipulated facts to indicate that there was any change in the strike situation until it ended on November 1st, with the sole exception of the movement of certain cars on October 29th under police protection, so I think the proper inference to be drawn from the conversation between the defendant's traffic manager and the carrier's yardmaster on August 10th was only a recognition by both that the attitude of the strikers and their sympathizers was such that, until the strike ended or abated, it would be useless for the switching crew to make further attempts to enter defendant's premises for the purpose of either spotting the nine loaded cars for unloading, or to remove the four cars which had been loaded and were awaiting removal. I see nothing in this circumstance which would in any way indicate that the strike was attributable to defendant company or in any way excused the carrier from making actual placement of the nine loaded cars so that they would be in accessible positions for unloading or removing the four loaded cars.

The particular tariff rule here applicable is Rule 3, Section D, Note 1, which reads as follows:

" 'Actual placement' is made when a car is placed in an accessible position for loading or unloading or at a point previously designated by the . . . consignee.

"If such placing is prevented by a cause attributable to consignor or consignee and the car is placed on the private or other-than-public-delivery track serving the consignee, it shall be considered as constructively placed, without notice."

Under the tariff rules effective, there can be no constructive placement of any cars until actual placement by the carrier is prevented by a cause attributable to consignor or consignee. The plaintiffs cite no authority to the proposition that the strike in the instant case was attributable to defend-

ant company. If the carrier was prevented from doing its job by a cause beyond its control, that does not mean that the cause was attributable to defendant. In none of the cases cited in the majority opinion is the fact that the cause for the detention must be attributable to the consignee or consignor discussed or considered. I am of the opinion, that upon the stipulated facts, the judgment in both cases should be reversed and the complaints dismissed upon the merits.

Mr. Justice FOWLER authorizes me to state that he concurs in this dissent.