Baltimore and Ohio Railroad Company, Appellant, v. Illinois Steel Company, Appellee.

Gen. No. 42,145.

Heard in the third division of this court for the first district at the February term, 1942. Opinion filed December 9, 1942.

H. D. SHEEAN and E. W. LADEMANN, both of Chicago, for appellant.

KNAPP, ALLEN & CUSHING and ADOLPH J. RADOSTA, JR., all of Chicago, for appellee.

REHEARING OPINION.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

In an amended complaint filed in the superior court of Cook county on February 28, 1934, plaintiff sought to recover of the defendant a balance of freight charges claimed to be due on a number of shipments of sulphate of ammonia, made by defendant as consignor from its plant at Gary, Ind. to Wholesale Phosphate & Acid Works, Inc., Baltimore, Md., as consignee, for export. Plaintiff attached a statement marked Exhibit "A," giving complete data as to each shipment, including the lawful charge, the amount paid by defendant and the balance claimed to be due. Defendant prepaid the freight charges at the export rate and the additional charges are alleged to be due because the export rate was not applicable to the shipments, but that the domestic rate, which is higher than the export rate, was the one applicable under the tariffs of the carriers involved. The case was tried before the court upon a stipulation of facts. The court found the issues in favor of the defendant and entered judgment for costs against the plaintiff. This appeal followed.

The parties stipulated that the plaintiff is a common carrier by railroad operating a line of railroads through various States of the United States, and in particular, from Chicago, Ill., eastward to Baltimore, Md.; that the plaintiff, as such common carrier, has published and filed with the Interstate Commerce Commission its classifications, rates and tariffs for the transportation of goods over its line of railroad; that defendant is a corporation and at all times herein referred to it had a steel mill located at Gary, Ind., from which point it made large shipments of ammonia sulphate; that defendant on various dates between August 9, 1929 and February 18, 1931 made large ship-

ments of ammonia sulphate from Gary, Ind. to Baltimore, Md.; that the various dates on which the said shipments were made appear on the statement attached to the amended complaint and that said statement is marked Exhibit "A" and made a part of said amended complaint; that said shipments were loaded in cars at the plant of the defendant at Gary, Ind. and delivered to Elgin, Joliet and Eastern Railway Company; that Elgin, Joliet and Eastern Railway Company delivered said cars so loaded to the plaintiff herein to complete the transportation thereof to Baltimore, Md.; that the consignee of the shipments, the Standard Wholesale Phosphate & Acid Works, Inc., deals in sulphate of ammonia; that the consignee is not owned or controlled by the defendant (consignor) and that the consignor and consignee are entirely separate and distinct corporations; that consignee's plant is located on the waterfront in the Curtis Bay District of Baltimore, Md., and includes two buildings built partly into or over the water of Curtis Bay, alongside of which buildings the cars containing the shipments in question were placed on tracks by the plaintiff; that these two buildings are used for storing, mixing and bagging commodities moving in both domestic and export commerce, and branch on to or abut wharves at which steamers are berthed for receiving and discharging cargoes; that the said shipments of sulphate of ammonia arrived in bulk and were unloaded from said cars through doors in the sides of said buildings and dumped into bins; that the said shipments of sulphate of ammonia were later placed in bags and handled through the doors in the ends of the building across short uncovered wharves or aprons and loaded into steamers alongside such wharves and exported; that the so-called domestic rate on sulphate of ammonia from Gary, Ind. to Baltimore, Md. was published in Jones' Tariff No. I.C.C. 2123 and was 38.5¢ per 100 pounds; that the so-called export rate on sulphate of

ammonia from Gary, Ind. to Baltimore, Md. was published in Agent Jones, Tariff No. I.C.C. 2123 at 28¢ per 100 pounds, and said tariff carried the following rule as Item Number 9322:

"The rates named in this tariff, or as same may be amended, and designated as 'export rates' will apply only on traffic delivered by the Atlantic Port Terminal carriers to the steamer or steamer's dock upon arrival at the port or after storage or transit has been accorded by the port carrier at the port under tariffs which permit the application of the export rates and also on traffic delivered to the party entitled to receive it at the carrier's seaboard stations to which export rates apply which traffic is handled direct from the carrier's stations to steamship docks and on which required proof of exportation is given (CFA Inf. 8179)."

that the defendant and said Elgin, Joliet and Eastern Railway Company, at the time of making each shipment, entered into a written contract or bill of lading to provide for the transportation of each of the shipments specified in said Exhibit "A," attached to the amended complaint; that each of said contracts or bills of lading provided that each of said shipments was for export, sometimes indicating that the shipment was for loading on vessel sailing from Baltimore, Md. on certain specified dates; that each of said contracts or bills of lading, among other things, specified the following:

"Consigned to Standard Wholesale Phosphate & Acid Works, Inc.

Destination—Curtis Bay—Baltimore, State of Maryland.

Route—EJ&E, Curtis, B&O—for export,

Freight rate—Prepaid 28¢ per 100# to Baltimore, Switching rate—none.

J. L.—destination N. A. 5 for export to Porto Rico. Must go through to coast without transfer on account of

liability of damage to contents consisting of sulphate of ammonia for fertilizer purposes.''

that each of the bills of lading covering the shipments contained the following provision, signed by the defendant by one of its authorized employees:

''If this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement: the carrier shall not make delivery of this shipment without payment of freight and all other lawful charges. (See Section 7 of Conditions.)

ILLINOIS STEEL COMPANY,

Per . . . . . . . . .

Signature of consignor.''

that each of said bills of lading contains the following: ''If charges are to be prepaid, write or stamp here 'To be Prepaid.' '' The words ''To be Prepaid'' were inserted by the defendant in the space provided at the time of the making of each such bill of lading; that each of said bills of lading contains the following:

''Received $ . . . . . to apply in prepayment of the charges on the property described hereon. . . . . . . . . Agent of Cashier Per . . . . (The signature here acknowledged only the amount prepaid.)''

that section 7 of the conditions of each of said bills of lading was as follows:

''Sec. 7. The owner or consignee shall pay the freight and average, if any, and all other lawful charges accruing on said property; but, except in those instances where it may lawfully be authorized to do so, no carrier by railroad shall deliver or relinquish possession at destination of the property covered by this bill of lading until all tariff rates and charges thereon have been paid. The consignor shall be liable for the freight and all other lawful charges, except that if the consignor stipulates, by signature, in the space provided for that purpose on

the face of this bill of lading that the carrier shall not make delivery without requiring payment of such charges and the carrier, contrary to such stipulation, shall make delivery without requiring such payment, the consignor (except as hereinafter provided) shall not be liable for such charges. Provided that, where the carrier has been instructed by the shipper or consignor to deliver said property to a consignee other than the shipper or consignor such consignee shall not be legally liable for transportation charges in respect of the transportation of said property (beyond those billed against him at the time of delivery for which he is otherwise liable) which may be found to be due after the property has been delivered to him. If the consignee (a) is an agent only and has no beneficial title in said property, and (b) prior to delivery of said property has notified the delivering carrier in writing of the fact of such agency and absence of beneficial title, and, in the case of a shipment reconsigned or diverted to a point other than that specified in the original bill of lading has also notified the delivering carrier in writing of the name and address of the beneficial owner of said property; and, in such cases the shipper or consignor, or in the case of a shipment so reconsigned or diverted, the beneficial owner, shall be liable for such additional charges. If the consignee has given to the carrier erroneous information as to who the beneficial owner is, such consignee shall himself be liable for such additional charges. Nothing herein shall limit the right of the carrier to require at time of shipment the prepayment or guarantee of the charges. If upon inspection it is ascertained that the articles shipped are not those described in this bill of lading, the freight charges must be paid upon the articles actually shipped.''

It is further stipulated and agreed that at the time of making each shipment the said Elgin, Joliet and Eastern Railway Company demanded freight thereon in the amount set forth under the heading ''Amounts Paid

By Defendant" in Exhibit "A" of the amended complaint herein, and that the defendant prepaid said amounts to said Elgin, Joliet and Eastern Railway as required by said contracts or bills of lading and that said Elgin, Joliet and Eastern Railway Company transported each of said shipments to Curtis, a point in the State of Indiana, and there delivered each of said shipments to the plaintiff, and that the plaintiff received, transported and delivered each of said shipments to Standard Wholesale Phosphate & Acid Works, Inc., at Curtis Bay, in the City of Baltimore in the State of Maryland; and that the plaintiff made delivery of said shipments without collection from the consignee, Standard Wholesale Phosphate & Acid Works, Inc., of any additional charges due or deemed by the plaintiff to be due on said shipments, or any of them; that said shipments and each of them moved in interstate commerce and that all the charges collected or to be collected thereon by the plaintiff were and are subject to the provisions of the Interstate Commerce Act; that at all of the times herein mentioned section 16 (3) (a) provided as follows:

"All actions at law by carrier subject to this Act for recovery of their charges, or any part thereof, shall be begun within three years from the time the cause of action accrues, and not after."

Section 16 (3) (e) provided:

"The cause of action in respect of a shipment of property shall, for the purpose of this section, be deemed to accrue upon delivery or tender of delivery thereof by the carrier, and not after."

that all of the shipments delivered to said Elgin, Joliet and Eastern Railway Company by the defendant for transportation prior to February 5, 1931, and shown on Exhibit "A" attached to the amended complaint, were delivered by the plaintiff at the destination specified in said bills of lading more than three years prior to the

filing of the original complaint herein; that the plaintiff is not entitled to recover the balance of the charges alleged to be due on shipments that were delivered more than three years prior to the institution of this suit; that the total freight charges at the export rate on the shipments delivered within three years prior to the institution of this suit was $9,801.93, which charges the defendant prepaid on said shipments; that the total freight charges on said shipments at the domestic rate was $13,477.45, a difference of $3,675.52; that if the court shall find that section 7 of the conditions of the bills of lading is not a bar to recovery by plaintiff from the defendant, then plaintiff is entitled to recover the sum of $3,675.52, being the amount due on the shipments delivered to the consignee within three years prior to the institution of this suit; if the court shall find that section 7 of the conditions of the bills of lading is a bar to recovery by the plaintiff from the defendant, then plaintiff is not entitled to recover.

Plaintiff's theory of the case is that section 7 of the conditions of the bills of lading can have no application to a prepaid shipment, particularly, under the facts and circumstances in this case, where the carriers, upon being advised that said shipments were for export, demanded payment of their charges in advance on the basis of the export rate, and had no notice or knowledge that said shipments, after delivery to consignee, would be so handled as to make inapplicable the export rate, and make applicable the domestic rate; that under section 7 of the conditions of the bills of lading the carriers have a right to "require at time of shipment the prepayment or guarantee of the charges" and that the defendant could not deprive the carriers of this right of prepayment by the execution of the stipulation under section 7 of the conditions of the bills of lading. Defendant's theory of the case, as stated by plaintiff, is that having executed the stipulations on the bills of lading referred to in section 7 of the conditions of the

bills of lading, and plaintiff having delivered the shipments contrary to such stipulations, has no recourse against the defendant, but must look to the consignee for any additional charges.

The shipments of sulphate of ammonia were delivered by the defendant as shipper and consignor to the Elgin, Joliet and Eastern Railway at Gary, Ind., consigned to the Standard Wholesale Phosphate & Acid Works, Inc., Baltimore, Md., and transported by that railroad and by plaintiff as terminal carrier. The shipments were made under uniform straight bills of lading in the forms prescribed by the Interstate Commerce Commission. At the time the shipments moved [and also today] there were two rates applicable to the shipments of this product from Gary to Baltimore, dependent upon whether the shipments were for export or domestic use. The rate on a shipment for export was and is lower than the rate on a shipment for domestic use. On each of the bills of lading issued upon the shipments involved here the defendant signified that the shipment was for export, and that the freight charges thereon were to be prepaid. The defendant prepaid to the Elgin, Joliet and Eastern Railway the freight charges on each shipment from Gary to Baltimore at the export rate. The initial carrier demanded the prepayment of the freight charges in the amount set out in Exhibit "A" and defendant prepaid the amounts so demanded. The railroad tariff which published the export rate on sulphate of ammonia from Gary to Baltimore carried the following limitation upon the application of that rate:

"The rates named in this tariff, or as same may be amended and designated as 'export rates' will apply only on traffic delivered by the Atlantic Port Terminal carriers to the steamer or steamer's dock upon arrival at the port or after storage or transit has been accorded by the port carrier at the port under tariffs which permit the application of the export rates and also on traffic delivered to the party entitled to receive it at the car-

rier's seaboard stations to which export rates apply, which traffic is handled direct from the carrier's stations to steamship docks and on which required proof of exportation is given."

It will be observed that each bill of lading specified that the merchandise was "consigned to Standard Wholesale Phosphate & Acid Works, Inc., destination, Curtis Bay, Baltimore, State of Maryland; route, E J & E, Curtis, B & O, for export; freight rate, prepaid 28¢ per 100# to Baltimore; switching rate, none." The stipulation recites that the plaintiff received, transported and delivered "each of said shipments to Standard Wholesale Phosphate & Acid Works, Inc., at Curtis Bay, Baltimore, Maryland; and that the plaintiff made delivery of said shipments without collection from the consignee, Standard Wholesale Phosphate & Acid Work Inc., of any additional charges due or deemed by the plaintiff to be due on said shipments or any of them." In its brief plaintiff states that "the shipments in question, upon arrival at Baltimore, were not delivered either to the 'steamer or steamer's dock' or to the 'carrier's seaboard stations,' but on the contrary were delivered by the plaintiff upon the consignee's instruction at a building used by the consignee for storing, mixing and bagging commodities moving in both domestic and export commerce." Since the shipments as handled after delivery to consignee did not meet the tariff requirements for the application of the rate, plaintiff demanded that the defendant pay the domestic rate on the shipments and upon defendant's refusal to pay, the instant suit was brought for the difference between the total freight charges on the shipments at the domestic rate and the total freight charges prepaid by the defendant on the shipments at the export rate. The defendant pleaded that certain items were barred by the limitation of section 16(3) (a) that "all actions at law by carriers subject to this act for recovery of·

their charges, or any part thereof, shall be begun within three years from the time the cause of action accrues, and not after.'' The stipulation disposed of this defense by providing that the total freight charges at the export rate on the shipments delivered within three years prior to the instant suit were $9,801.93, which the defendant prepaid, and that the total freight charges on the shipments at the domestic rate were $13,477.45, a difference of $3,675.52, and that if the court found that section 7 of the conditions of the bills of lading was not a bar to recovery by plaintiff, then plaintiff was entitled to recover the sum of $3,675.52.

Each of the bills of lading under which these shipments moved contained the following provision: ''If charges are to be prepaid, write or stamp here 'To be Prepaid.' '' The words ''To be Prepaid'' were inserted by the defendant in the space provided at the time of the making of each bill of lading, and the charges on each shipment were prepaid by the defendant to the initial carrier at the export rate. Each of the bills of lading had this further provision which was signed by the defendant:

''If this shipment is to be delivered to the consignee without recourse on the consignor, the consignor shall sign the following statement: The carrier shall not make delivery of this shipment without payment of freight and all other lawful charges. (See Section 7 of Conditions.)''

The pertinent portion of section 7 of the conditions of the bills of lading is as follows:

''Sec. 7. The owner or consignee shall pay the freight and average, if any, and all other lawful charges accruing on said property; but, except in those instances where it may lawfully be authorized to do so, no carrier by railroad shall deliver or relinquish possession at destination of the property covered by this bill of lading until all tariff rates and charges thereon have been paid.

The consignor shall be liable for the freight and all other lawful charges, except that if the consignor stipulates by signature, in the space provided for that purpose on the face of this bill of lading, that the carrier shall not make delivery without requiring payment of such charges and the carrier, contrary to such stipulation, shall make delivery without requiring such payment, the consignor (except as hereinafter provided) shall not be liable for such charges. . . . Nothing herein shall limit the right of the carrier to require at time of shipment the prepayment or guarantee of the charges. If upon inspection it is ascertained that the articles shipped are not those described in this bill of lading, the freight charges must be paid upon the articles actually shipped.''

It will be noted that the shipments were exported by the consignee. Plaintiff contends that the method of handling the shipments at destination by the consignee made the export rate inapplicable and resulted in the additional charge. By their stipulation, the parties have eliminated any controversy about the claim of the railroad for the additional charges, apparently recognizing that the shipments were not handled at the point of delivery in Baltimore in such a manner as to entitle them to the export rate. Defendant contends that because of the ''no recourse'' clause in the bill of lading plaintiff cannot prevail in its attempt to collect the undercharge from it. Plaintiff maintains that the trial court erred in finding the issues for defendant. To sustain the judgment, defendant asserts (1) the plaintiff, having failed to perform its contract by delivering the property without collection of the freight charges and all other lawful charges, is not entitled to recover from the consignor; (2) that the defendant has complied fully with the contract of transportation; that plaintiff cannot recover against· defendant in the absence of a showing that defendant has been guilty of a breach of the contract in some respect; (3) that the

bill of lading contracts, including the "no recourse" clause and section 7 of the conditions of said bill of lading, were valid, lawful, binding and enforceable contracts; (4) that although plaintiff has no recourse against the defendant in this case, the consignee, by accepting delivery of the property, became liable to the plaintiff for the charges and its liability satisfies requirements of the Interstate Commerce Act; (5) that there is no inconsistency resulting from the prepayment by the consignor of a portion of all of the charges at the export rate as shown on the face of the uniform bill of lading and the execution by the consignor of the "prepay" and the "no recourse" clauses in the bill of lading; that the consignor may prepay all or any part of the charges, and that the protection of the "no recourse" clause is not limited to "collect" shipments; and (6) that the very purpose of the executed "no recourse" clause is to protect the consignor from liability for freight and other charges, including subsequently discovered undercharges, in the event that the carrier, contrary to the provisions of said clause, parts with possession of the property without collecting all charges due the carrier; that the "no recourse" clause provides that if the carrier wishes to hold the consignor liable for the charges, the carrier must retain possession of the property until all the charges thereon have been paid; and that if the carrier makes delivery of the property without collecting all of said charges, the carrier can no longer hold the consignor liable, but thereafter must look solely to the consignee for payment of any unpaid charges.

The courts have uniformly held that it is the duty of the carrier to collect its lawful charges. Section 6 (7) Title 49 of the United States Code provides that no carrier shall engage in or participate in the transportation of passengers or property unless the rates, fares and charges have been filed and published in accordance with the provisions of that chapter, and that no

carrier shall charge, demand, collect or receive a greater or less or different compensation for such transportation, or for any service in connection therewith between the points named in such tariff, than the rates, fares and charges which are specified in the tariff filed and in effect at the time, and that no carrier shall refund or remit in any manner or by any device any portion of the rates, fares and charges so specified, nor extend to any shipper or person any privileges or facilities except such as are specified in such tariffs. Section 41 of this code provides that the wilful failure upon the part of any carrier subject to said chapter to file and publish the tariffs or rates and charges as required by said chapter, or strictly to observe such tariffs until changed according to law, shall be a misdemeanor. In *Davis v. Keystone Steel & Wire Co.,* 317 Ill. 278, the court said (288):

"The terms of every contract of shipment, so far as the service to be rendered and the compensation to be received are concerned, are fixed by the schedule filed with and approved by the Interstate Commerce Commission. No agreement of the parties can modify these terms, though expressed in writing and actually performed. The collection by the carrier of less than the schedule rate, though expressly agreed on, will not prevent the recovery of the shortage from the schedule rate. The rates defined by the tariff cannot be varied or enlarged by either contract or tort by the carrier."

In *Louisville & Nashville R. Co. v. Central Iron & Coal Co.,* 265 U. S. 59, Mr. Justice BRANDEIS, speaking for the Supreme Court, said (65):

"The shipment being an interstate one, the freight rate was that stated in the tariff filed with the Interstate Commerce Commission. The amount of the freight charges legally payable was determined by applying this tariff to the actual weight. Thus, they were fixed by law. No contract of the carrier could reduce

the amount legally payable, or release from liability a shipper who had assumed an obligation to pay the charges.''

The Interstate Commerce Commission does not purport to determine upon whom the liability to pay transportation charges shall fall. This is a matter of contract in no way controlled by the Interstate Commerce Commission. The Interstate Commerce Act is not concerned with who shall pay the transportation charges. It permits the carrier to make any contract it may see fit with reference to who shall pay the charges. Its only purpose is to prevent discrimination and rebates. It prohibits the application of any act or conduct as estopping a carrier from exacting the lawful freight rate. (*Alton R. Co. v. Gillarde,* 379 Ill. 308, 313.) In the *Central Iron Co.* case, the Federal Supreme Court said (65):

''But delivery of goods to a carrier for shipment does not, under the Interstate Commerce Act, impose upon a shipper an absolute obligation to pay the freight charges. The tariff did not provide when or by whom the payment should be made. As to these matters carrier and shipper were left free to contract, subject to the rule which prohibits discrimination. The carrier was at liberty to require prepayment of freight charges; or to permit that payment to be deferred until the goods reached the end of the transportation. *Wadley Southern Ry. Co. v. Georgia,* 235 U. S. 651, 656. Where payment is so deferred, the carrier may require that it be made before delivery of the goods; or concurrently with the delivery; or may permit it to be made later. . . . To ascertain what contract was entered into we look primarily to the bills of lading, bearing in mind that the instrument serves both as a receipt and as a contract. Ordinarily, the person from whom the goods are received for shipment assumes the obligation to pay the freight charges; and

his obligation is ordinarily a primary one. This is true even where the bill of lading contains, as here, a provision imposing liability upon the consignee. For the shipper is presumably the consignor; the transportation ordered by him is presumably on his own behalf; and a promise by him to pay therefor is inferred (that is, implied in fact), as a promise to pay for goods is implied, when one orders them from a dealer. But this inference may be rebutted, as in the case of other contracts. It may be shown, by the bill of lading or otherwise, that the shipper of the goods was not acting on his own behalf; that this fact was known to the carrier; that the parties intended not only that the consignee should assume an obligation to pay the freight charges, but that the shipper should not assume any liability whatsoever therefor; or that he should assume only a secondary liability.''

In a footnote on page 66 in the *Central Iron Co.* case, the Supreme Court added:

''See Interstate Commerce Commission Conference Ruling No. 314, Bulletin No. 7, issued August 1, 1917: 'The law requires the carrier to collect and the party legally responsible to pay the lawfully established rates without deviation therefrom. It follows that it is the duty of carriers to exhaust their legal remedies in order to collect undercharges from the party or parties legally responsibile therefor. It is not for the Commission, however, to determine in any case which party consignor or consignee, is legally liable for the undercharge, that being a question determinable only by a court having jurisdiction and upon the facts of each case.' This ruling which was adopted May 1, 1911 and '.interpreted' May 4, 1918, was amended, on March 6, 1922, by calling attention to the provision inserted in the Uniform Domestic Bill of Lading prescribed October 21, 1921. By that provision the consignor may (see Section 7 of Conditions and clause on face of bill)

relieve himself of all liability for freight charges. In the Matter of Bills of Lading, 52 I. C. C. 671, 721; 64 I. C. C. 347; ibid, 357; 66 I. C. C. 63.''

In a case entitled In the Matter of Bills of Lading, I.C.C. Docket No. 4844, decided April 14, 1919, 52 I.C.C. 671, the commission prescribed uniform bills of lading, including the form of domestic straight bill of lading. Speaking of the ''no recourse'' clause, the commission said:

''In order to secure exemption from liability for the freight charges in case the shipment is delivered to the consignee without the collection of such charges, the consignor is required to append his signature to the following statement in a space on the face of the bill of lading for that purpose: 'The carrier shall not· make delivery of this shipment without payment of freight and other lawful charges.' ''

In the case of *Michigan Central R. Co. v. Saginaw Milling Co.,* 272 Mich. 625, 262 N. W. 425, the Supreme Court of Michigan said (426):

''The purpose of the nonrecourse clause is to relieve the consignor· of liability and its presence in an order bill of lading, when properly executed, should be given effect. The carrier and the shipper are left free to contract subject to the rule which prohibits discrimination.''

In the case entitled In the Matter of Bills of Lading, 52 I.C.C. 671, 721, the Interstate Commerce Commission said:

''A primary right of the carrier in the conduct of its business is that of reasonable compensation for the service rendered by it, and it is entitled to assure itself of such compensation by demanding it in advance.''

There is no contention that the defendant committed any fraud. Both plaintiff and defendant believed in good faith that the shipments would be exported, and

the bills of lading bore a notation that they were for export. Plaintiff accepted the charges paid to the initial carrier in accordance with the directions on the bills of lading, and it had no knowledge until after the shipments had been delivered to the consignee at Baltimore that the provisions of the export tariff would not be complied with and that the domestic rate would be the only rate legally applicable to the shipments. Defendant invokes the "no recourse" provision of section 7 of the conditions of the bills of lading. Plaintiff's position is that the "no recourse" provision is limited to "collect" shipments, and does not relate to "prepaid" shipments, where the consignor has expressly undertaken to prepay the freight. Defendant contends that there is no inconsistency resulting from the prepayment by the consignor of a portion or all of the charges at the export rate as shown on the face of the bills of lading and the execution by the consignor of the "prepay" and of the "no recourse" clauses, and that the protection of the "no recourse" clause is not limited to "collect" shipments. Defendant points out that it is a general principle of construction that, if possible, an instrument should be construed as to give effect to all of its provisions, and that in this case it is possible to give effect to both the "prepay" and the "no recourse" clauses because the shipper, in effect, stated that it had a shipment to Puerto Rico, and wished to prepay the charges to Baltimore; that it asked the carrier how much the charges would be; that on being informed the charges would be 28¢ per 100 pounds to Baltimore the shipper agreed to prepay the amount thus demanded; that to protect itself from liability for any additional charges which might accrue over and above those which the defendant by its sales contract with the consignee and by its transportation contract with the initial carrier had agreed to pay, the consignor in executing the bill of lading also signed the "no recourse" clause, which meant the carrier could

not have recourse upon the consignor if it delivered the property without collecting all of the charges lawfully due. Defendant also contends that the very purpose of the executed "no recourse" clause is to protect the consignor from liability for freight and other charges, including subsequently discovered undercharges, in the event that the carrier, contrary to the provisions of the clause, parts with possession of the property without collecting all charges due the carrier. Defendant points out that although the carrier has no recourse against the defendant, the consignee, by accepting delivery of the property became liable to the carrier for the charges, and its liability satisfies the requirements of the Interstate Commerce Act.

Section 7 of the conditions of the bills of lading provides that the consignor "shall be liable for the freight and all other lawful charges, except that if the consignor stipulates, by signature, in the space provided for that purpose on the face of this bill of lading that the carrier shall not make delivery without requireing payment of such charges, and the carrier, contrary to such stipulation, shall make delivery without requiring such payment, the consignor (except as hereinafter provided) shall not be liable for such charges." Further along in section 7 appears the following: "Nothing herein shall limit.the right of the carrier to require at time of shipment the prepayment or guarantee of the charges." It is clear that in the bill of lading the carrier reserves the right to demand prepayment of its charges. Having this right, it follows that the shipper is obligated to pay such charges where the demand is made. Each bill of lading carried the provision signed by the shipper that "the carrier shall not make delivery of this shipment without payment of freight or all other lawful charges." It is evident that the language "nothing herein shall limit the right of the carrier to require at time of shipping the prepayment or guarantee of the charges," limits

the right of the shipper in the exercise of the privilege granted by the "no recourse" clause. It is obvious that if nothing shall limit the right of the carrier to require at the time of shipment the prepayment or guarantee of the charges, the "no recourse" clause could not be construed as giving the shipper the right to deprive the carrier of its charges. In the *Central Iron Co.* case the Supreme Court pointed out that the carrier was at liberty to require prepayment of the freight charges. Our inquiry then should be directed to ascertaining whether the carrier did exercise its right to require at the time of each shipment the prepayment of the charges. It will be observed that each of the bills of lading contains the following: "If charges are to be prepaid, write or stamp here 'To be Prepaid.' " The words "To be Prepaid" were inserted by the defendant in the space provided at the time of making each bill of lading. The parties stipulated that at the time of making each shipment the initial carrier demanded the freight thereon in the amount set forth under the heading: "Amounts paid by defendant" in Exhibit "A" of the amended complaint, that the defendant prepaid said amounts to the initial carrier as required by the bill of lading, that the initial carrier transported each of the shipments to Curtis, Ind. and there delivered each of the shipments to the plaintiff. The stipulation further provides that "the total freight charges at the export rate on the shipments delivered within three years prior to the institution of this suit was $9,801.93, which charges the defendant prepaid on said shipments; that the total freight charges on said shipments at the domestic rate was $13,477.45, a difference of $3,675.52." This sum of $3,675.52 is the difference between the export rate and the domestic rate. No contract of the carrier could reduce the amount legally payable, or release from liability a shipper who has assumed an obligation to pay the charges. The initial carrier

insisted on the payment of the charges. This carrier did not demand payment of part of the charges. It did not demand payment of charges on account. The initial carrier could not demand payment of the domestic rate until it appeared that the shipments would not take the export rate. Each bill of lading recited that the merchandise was "for export," and that the freight rate was prepaid at 28¢ per 100 pounds to Baltimore. The parties knew that this was the export rate. It is plain that the initial carrier was demanding and the shipper was prepaying the charges, and that each understood that the export rate was applicable. Following the direction of the bill of lading that "if the charges are to be prepaid, write or stamp here 'To be Prepaid,'" the words "To be Prepaid" were inserted by the defendant in the space provided at the time of making each such shipment. We are satisfied that when the initial carrier demands that the charges be prepaid, which it has a clear right to do, that the "no recourse" clause is not applicable. Defendant points out that the shipper has the right to prepay any part or all of the charges if he wishes, and that it is a common practice for the consignor to prepay part of the charges and for the carrier to collect the remainder of the charges from the consignee. Nevertheless, the carrier can insist upon its right to require prepayment of its charges. Where a carrier accepts part payment of its charges from the consignor, that, of course, would not be a prepayment. At most it would be a prepayment of part of the charges. In a case where the railroad company accepted part payment of the charges and the shipper signed the "no recourse" stipulation, we are of the opinion that this stipulation would be effective to protect the shipper as to the balance of the charges. In such a situation it is manifest that the carrier would not be demanding prepayment of its charges. It would be a contradiction to

say that the railroad company insisted on the charges being prepaid and that the shipper could not be required to pay any deficiency if the proper charges were not collected. When a shipper is required to prepay the charges, that means he is to pay all of the charges applicable to the merchandise being moved. The initial carrier required defendant to prepay the charges. In our opinion the charges which defendant agreed to pay were whatever charges were applicable to the commodity. We are of the opinion that the "no recourse" clause is not applicable to the situation covered by the stipulation.

Referring to the clause that "if upon inspection it is ascertained that the articles shipped are not those described in this bill of lading, the freight charges must be paid on the articles actually shipped," plaintiff contends that defendant described the goods as being for export, when in fact they were domestic goods under the carrier's tariff, and that the change in character did not reveal itself until the goods had been delivered to the consignee and could not possibly have been known to plaintiff until the delivery had been made. This is not a case of misdescription.

While it is true that the commodity shipped was sulphate of ammonia and that sulphate of ammonia was shipped, the export rate was applied on the assumption that the handling of each shipment would be in accordance with the tariff regulation. Plaintiff had no control over the handling of each shipment after it was delivered to the consignee at Baltimore. Defendant, in selling its product, had the opportunity to contract with the purchaser so as to protect itself by requiring that each shipment be handled so that the export rate would be applicable. Defendant states that it prepaid the charges on the shipment at the export rate and that it had no way of knowing what might happen to the shipment after delivery at Baltimore. Plaintiff points out that if the defendant

did not know what the consignee might do with the shipment, how was it (plaintiff) to know? The shipping instructions from the defendant directed that delivery be made to the Wholesale Phosphate & Acid Works, Curtis Bay, Baltimore, Md., for export. These instructions were carried out and delivery made as directed. There were no additional charges due up to the time of delivery. We agree with the plaintiff that it would be unreasonable to expect that plaintiff should have anticipated that the consignee might not comply with the export tariff and should have withheld delivery, although the freight charges had been paid. Plaintiff required the payment of its charges at the time of shipment. At that time the defendant designated the shipments as for export and defendant prepaid the charges at the export rate. A subsequent examination as to the handling of the shipments revealed that the export rate was not applicable. A fundamental error in defendant's reasoning is that it fails to appreciate that the carrier has the right to insist upon the prepayment or guarantee of the charges, for by the express terms of section 7 of the conditions of the bills of lading, nothing therein "shall limit the right of the carrier to require at the time of shipment the prepayment or guarantee of the charges." Where the carrier manifests an intention to demand prepayment of the charges, the signing of the "no recourse" stipulation by the shipper is ineffective. Defendant suggests that if it had been the intention of the framers of the uniform bill of lading to make the "no recourse" clause inapplicable to shipments marked "To be Prepaid," they would have expressly provided in section 7 that the "no recourse" clause should not apply in cases where the prepaid clause of the bill of lading has been executed. Defendant insists that both the "prepaid" and "no recourse" clauses can be given effect and that the court should construe the bill of lading contract so as to give

effect to all of its provisions. The law requires a shipper to pay all of the charges in advance if demand therefor is made by the carrier. Delivery of the shipment does not change the primary obligation of the shipper to pay the charges. Where the carrier insists on prepayment of the charges the shipper cannot by signing the ''no recourse'' stipulation, avoid its obligation to pay all of the charges, and if through some mistake all of the charges are not collected in advance, the liability of the shipper to pay persists. Counsel for the defendant submitted to us a copy of an opinion filed November 10, 1942 in the United States District Court for the District of Minnesota Fourth Division in the case of *Chicago Great Western Ry. Co. v. Hopkins*, No. 497 Civil. While this opinion is in point on the issues before us, we do not agree with the reasoning or the result.

We are of the opinion that the ''no recourse'' clause of the conditions of the bill of lading was not applicable to the shipments of sulphate of ammonia, and that plaintiff is entitled to recover the difference between the domestic rate and the export rate on the shipments delivered within three years prior to the institution of the suit, or $3,675.52. Therefore, the judgment of the superior court of Cook County is reversed and the cause remanded with directions to enter a judgment for the plaintiff and against defendant in the sum of $3,675.52 and costs.

*Reversed and remanded with directions.*

HEBEL and KILEY, JJ., concur.