**City of Chicago, Appellant, v. Peoples Gas Light and Coke Company, Appellee.**

**Gen. No. 43,500.**

Opinion filed November 20, 1946.   Released for publication December 5, 1946.

BARNET HODES, Corporation Counsel, for appellant; JOSEPH F. GROSSMAN, First Assistant Corporation

Counsel, J. HERZL SEGAL, Head of Appeals and Review Division and L. LOUIS KARTON, Assistant Corporation Counsel, of counsel.

DAILY, DINES, WHITE & FIEDLER and SIDLEY, AUSTIN, BURGESS & HARPER, all of Chicago, for appellee; FRANCIS L. DAILY, KENNETH F. BURGESS, HOMER D. DINES and DOUGLAS F. SMITH, all of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

The Peoples Gas Light and Coke Company was organized by special Act of the Illinois legislature passed February 12, 1855, as amended by a special Act of February 7, 1865. By these enactments it received a right to use any or all of the streets of the City of Chicago for distribution of gas, subject to its procuring the consent of the city. By its ordinance of August 30, 1858, the city gave its consent. By an ordinance of December 22, 1890, as amended on December 29, 1890 and July 13, 1891, the Chicago Economic Fuel Gas Company was granted the right to construct and operate works for the manufacture of fuel gas, and rights of way under the public ways of the city for the purpose of placing and maintaining lines for the distribution of natural and manufactured gas. In the amendment passed December 29, 1890 the term of the ordinance was fixed at 25 years from and after its acceptance. The ordinance was accepted January 19, 1891. By special Act of June 5, 1897 authority was given to any gas companies doing business in the same city to consolidate and merge into a single corporation. In 1897, pursuant to that Act, the Peoples Company absorbed seven other companies, including the Economic Fuel Gas Company. In 1898 the Hyde Park was also consolidated and merged into the Peoples Company. The Economic Company obligated

itself to pay to the city five per cent on the gross receipts from the sale of natural gas during the term of the ordinance. The grant was for 25 years and the obligation of the Economic Company to pay ran concurrently with the grant, or until January 19, 1916. The Economic Company never distributed illuminating gas or manufactured fuel gas. It limited itself to the distribution of natural gas, and had a relatively small system, covering only approximately seven per cent of the total area of the city. As a result of the consolidation in 1897 the Peoples Company assumed the obligations of the Economic Company in respect to paying five per cent of its gross revenue from the sale of natural gas ''in the same manner and to the same extent as if the companies had remained individual and distinct.'' In the consolidation the Peoples Company was obligated to pay the five per cent promised to be paid to the city by the Economic Company until January 19, 1916. After the consolidation in 1897 the Peoples Company did not supply natural gas through its general distribution system which covered the entire city, but only through the separate Economic system. Not until August 1, 1917, after the expiration of the 25 year term of the Economic ordinance, was a physical connection made between the separate. Economic distribution system and the general gas distribution system of the Peoples Company.

On October 15, 1900 the city council by ordinance reduced the rate on gas from $1 per thousand cubic feet to 75c. This ordinance was attacked in the courts by the Peoples Company as confiscatory, violative of contract rights and beyond the power of the city. It became the subject of protracted litigation which twice reached the Supreme Court of the United States. (*The Peoples Gas Light & Coke Co. v. City of Chicago*, 114 Fed. 384, aff'd 194 U. S. 1; *Mills v. City of Chicago*, 127 Fed. 731, 143 Fed. 430, aff'd 204 U. S. 321.) Three gas companies were then serving Chicago, namely, the

Peoples Company, Ogden Gas Company and the Universal Gas Company. The term of the ordinance under which the Ogden Company was operating, expired February 25, 1945. This company was required to pay an amount equal to $3\frac{1}{2}$ per cent of the gross revenue and receipts from the sale of gas. Under the ordinance granting the Universal Company the right to operate, it was obligated to pay 10 per cent of the gross amount which it collected from its general consumers if the charge was $1 per thousand cubic feet. Should the charge be reduced to 90c per thousand cubic feet, the obligation to pay compensation was to cease. The term of the ordinance was until August 22, 1944. The Peoples Company became successor to the Ogden Company and the Universal Company and is now the sole company manufacturing or distributing gas in Chicago.

By the amendment to the charter of the Peoples Company passed February 7, 1865, the legislature provided that ''said Common Council of the City of Chicago shall in no case be authorized to compel the said company to furnish gas at a less rate than three dollars per thousand [cubic] feet.'' In the following years, Peoples Company made reductions in the rate with the result that in 1897 the charge stood at $1 per thousand cubic feet. The Consolidation Act of 1897, under which the Peoples Company absorbed a number of other gas companies, provided that the consolidated company should not increase the price charged for gas of the quality furnished to consumers during any part of the year immediately preceding such purchase, lease or consolidation or merger. It was the contention of the Peoples Company that following the merger, the existing rate of $1 per thousand cubic feet become a statutory rate, and that pending further action by the legislature the company could not be compelled to establish a lower rate. (*Davis v. Keystone Steel & Wire Co.*, 317 Ill. 278, 283.) The status of the litigation

involving the power of the city to compel a reduction, was discussed in the city council. The city, which had been making annual contracts with the Peoples Company for lighting the streets, omitted, after the expiration of the contract covering the year 1901, to enter into any further contracts with the company. It also ceased, after 1901, to pay for the gas which was currently furnished to it by the Peoples Company. By the end of 1905 the city owed the Peoples Company for gas a total of $1,263,546.38, as to which it had an offset under the obligation of the Economic Company assumed by the Peoples Company in 1897, of $281,985.67. This left an unpaid balance due from the city of $981,560.73. The city also claimed that $117,000 was due to it from the Ogden Company under provisions of its franchise. Negotiations looking to a settlement of the dispute took place and the entire subject matter was given careful consideration by the committee on gas, oil and electric light. The city council directed this committee to take up the matter of establishing maximum rates, to employ such experts as it deemed necessary, and to report its findings as to "just and reasonable rates" not later than January 15, 1906. The committee made a thorough investigation of the matter and began consideration of the possibility of a settlement agreement. During the negotiations in November and December 1905 and January 1906, the committee, through Alderman Raymer, proposed a rate of 85c per thousand cubic feet. Counsel for the Peoples Company proposed a rate of 90c. In a report to the city council adopted January 29, 1906, the committee reviewed the results of its negotiations with the companies, submitted a draft of ordinance to effectuate the settlement, and in conclusion summarized the essential features of the proposed ordinance and the reasons for its enactment. The committee stated that the reduction in the price of gas to 85c meant an annual saving to the people of $1,800,000, or a total of $9,000,000 for

five years, or $11,000,000 in five years should the natural increase in the consumption of gas continue as in the preceding five years. The committee recommended the passage of the ordinance. It was passed on February 14, 1906 in the form recommended and accepted by the three companies on February 26, 1906.

The 1906 contract ordinance fixed the gas rate for the succeeding five years from and after the taking effect of the ordinance at 85c per thousand cubic feet. By sec. 8 of this ordinance the Ogden Company and the Universal Company were released and absolved from the payment "from and after the taking effect of this ordinance," of the compensation provided to be paid the city by the ordinances of February 25, 1895 and July 23, 1894, respectively. Sec. 8 concludes:

"And the Peoples Gas Light and Coke Company, the Ogden Gas Company and the Universal Gas Company are hereby severally released and discharged from all obligations to make payment of any compensation to the City of Chicago under said ordinances or otherwise; provided, however, nothing herein contained shall ever be construed as releasing or waiving the existing obligation to pay, from and after the passage and taking effect of this ordinance, five per cent of the gross receipts from the sale of natural gas, as hereinafter mentioned."

Sec. 9 of the 1906 ordinance reads:

"The amount due from the Peoples Gas Light and Coke Company to the City of Chicago up to the time of taking effect of this ordinance, being five per cent of the gross revenue derived from the sales of natural gas, shall be paid to the City of Chicago by crediting said amount upon the sum of upwards of $1,300,000 due from the City of Chicago to the Peoples Gas Light and Coke Company for gas furnished for lighting the streets of the City of Chicago by said Peoples Gas Light and Coke Company. . . . The Peoples Gas

Light and Coke Company shall pay the five per cent cent on the gross revenue derived from the sales of natural gas in the City of Chicago from and after the taking effect of this ordinance.''

On January 23, 1942 the City of Chicago filed a complaint at law in the circuit court of Cook county against the Peoples Gas Light and Coke Company to recover compensation of five per cent of the gross receipts of the defendant from its sale of natural gas for the years 1931 to 1940 inclusive. Plaintiff bases its claim upon the provisions of the ordinance accepted by defendant on February 26, 1906. The case was tried by the court without a jury on a printed stipulation of the facts. The court found the issues for defendant and entered judgment accordingly and this appeal followed.

Plaintiff maintains that the ordinance of February 14, 1906 imposed upon defendant an obligation which exists so long as the ordinance remains effective, to pay to plaintiff five per cent of its gross receipts from the sale of natural gas. The basic question of liability turns upon the intention of the parties to be derived from the terms of the 1906 ordinance. Plaintiff contends that under that ordinance the defendant entered into a new and direct obligation to pay five per cent of the gross receipts from the sale of natural gas, that obligation to continue so long as the 1906 ordinance remained in effect. Defendant maintains that the 1906 ordinance shows on its face that it was not intended to and did not create a new obligation upon defendant, but simply recognized and preserved the ''existing obligation'' contained in the Economic ordinance of 1891 to pay ''the five per cent.'' Plaintiff admits that the obligation referred to in sec. 9 of the ordinance is the old obligation of the Economic Company, and asserts that its admission that the language of sec. 9 refers to the old obligation of the Economic Company, does not preclude the contention by it that

defendant assumed an original and direct obligation, and that the concept of the continuation of the old obligation is negatived by the phrase ''from and after the taking effect of this ordinance.'' It is significant that the same words were used in the Economic Company ordinance in creating the obligation to pay the five per cent for the period of 25 years and that sec. 8 of the ordinance of 1906 uses the same words describing the old obligation. We agree with defendant that the repetition of these words in sec. 9, far from creating a new and different obligation, made the identification of the old obligation more complete.

The 1906 ordinance read as a whole, was in the nature of a clean-up arrangement. It covered the whole range of the relationship between the city and the companies and disposed of all the then pending controversies between them. A check of the terms of the ordinance against the proceedings and report of the committee which recommended it to the council, shows that every existing obligation was either specifically cancelled or specifically preserved or continued. The tenor of the 1906 ordinance was to settle disputes through the medium of releases and relinquishments of obligations which had been the subject of controversy. Its purpose was not to make new grants or create new obligations. It contains two separate provisions respecting the existing five per cent obligation. The first relates to the amount which had accrued thereunder up to the time of the passage of the ordinance, and the second to the amount which would accrue from and after the passage of the ordinance. In the 1906 ordinance the city secured the cancellation of an admitted net liability of approximately $1,000,000. The city, notwithstanding its lack of power over rates, succeeded in securing a reduction in the charges of defendant amounting to approximately $11,000,000 for the five year period covered by the agreement. It is interesting to note that on July 17, 1911, following the expiration of the

1906 ordinance, the city, relying upon the Act of
May 18, 1905, passed an ordinance purporting to fix
the charge for gas for the ensuing five years. In
*Sutter v. People's Gas Light & Coke Co.*, 284 Ill. 634,
our Supreme Court held the Act of 1905 to be un-
constitutional. Plaintiff declares that it "received
nothing as consideration for the relinquishment of
these rights unless the ordinance is construed as sub-
stituting for all of the obligations to pay compensation,
a new obligation to pay five per cent of the revenue
derived from the sale of natural gas, not merely until
1916, but perpetually. Otherwise the city would be
gratuitously abandoning valuable rights under the
various franchise ordinances." Following this line of
argument, plaintiff points out the releases of the obli-
gations of the Ogden Company and the Universal
Company. The committee and the city council were
conversant with the facts and acted accordingly. It
is manifest that the city, through its corporate author-
ities, was primarily concerned with the arrangement
of reduced rates on gas for itself and the general
public. The agreement which emerged from the
negotiations and resulted in the contract ordinance of
1906, accomplished what the city authorities sought.
There is no doubt that in the same contract ordinance,
defendant also obtained valuable concessions. We are
of the opinion that the intent of the 1906 ordinance, so
far as it affects the issues involved in this suit, was
to preserve "the existing obligation" for the re-
mainder of its term and not to create a new or different
obligation.

Defendant maintains that the conduct of the parties
subsequent to the acceptance of the 1906 ordinance
confirms the interpretation relied upon by it. The city
contends that two acts of defendant shortly after
January 19, 1916, when the latter claims its obligations
expired, are inconsistent with its contention here. De-
fendant distributed a diminishing supply of natural

gas through the separate system which it had acquired from the Economic Company up to August 1, 1917. Then defendant ceased to supply any natural gas and the separate Economic system was by physical connection made a part of the general gas distribution system of defendant. For the gas sold by it through the Economic distribution system up to and including August 1, 1917, defendant paid to the city five per cent of its gross receipts from such sales. The city contends that by making these payments on gas sold subsequent to January 19, 1916, defendant recognized the existence of a continuing obligation. On February 3, 1919 the secretary of defendant wrote the following letter to the comptroller of plaintiff:

''In reply to your letter of January 28th referring to compensation at the rate of 5% of the gross receipts from the sale of natural gas for year ending December 31, 1918: I wish to advise that no natural gas was sold in Chicago during the year 1918.''

The making of the five per cent payments to plaintiff had for a number of years been handled as one of the regular duties of members of the clerical staff of defendant. The payments applicable to periods subsequent to January 19, 1916 were made without any discussion or consideration of the expiration date of the Economic ordinance and were not the subject of any action by the board of directors of defendant. In our opinion, the letter of February 3, 1919 from the secretary of defendant does not constitute an implied admission against defendant. On receipt of the inquiry the secretary ascertained that the payments had been made for a number of years as a matter of clerical routine and that no natural gas had been sold during the period of the inquiry. That information was sufficient for his purpose and there was no duty resting upon him to suggest additional reasons as to why no payment was due to plaintiff for the year 1918. We find that neither the making of the monthly payments

after January 19, 1916, or the letter of February 3, 1919 constituted an act of management which recognized either that the obligation imposed by the Economic ordinance was continuing, or that it has been superseded in the 1906 ordinance by another of undeterminate length.

On June 25, 1917 the city council passed an ordinance providing that all gas thereafter sold by defendant should be fuel gas conforming to specified standards of heating value instead of candle power, as theretofore. There was a significant provision in the ordinance that it "shall not extend or enlarge" the franchises formerly granted to the Economic Company; also, a declaration that no rights or obligations of plaintiff, defendant or the Economic Company were to be affected in any way. When the parties began their negotiations on December 10, 1915, the Economic ordinance had a few weeks to run. When the new ordinance was finally passed in 1917, the life of the Economic ordinance had expired. The parties, however, in the ordinance, made it plain that the new ordinance was not to extend or enlarge the expired Economic franchise rights or obligations. This action is inconsistent with plaintiff's position that the 1906 ordinance had substituted a new and different obligation for the obligation contained in the Economic ordinance of 1891. The fact that the plaintiff in the 1917 ordinance negatived any extension of the 1891 Economic ordinance, shows that it understood that the 1906 ordinance had added nothing to the 1891 ordinance and that the payments made after 1906 were made, not pursuant to any rights acquired by plaintiff under the 1906 ordinance, but to those originally acquired by it under the 1891 ordinance. It will be noted that defendant did not acquire the franchise rights of the Economic Company. It had the right to supply natural gas in Chicago in its own right. So long as the Economic ordinance lasted, defendant was bound to discharge the burdens of that ordinance.

For a period of 14 years, from August 1, 1917 to October 16, 1931, no natural gas was sold by defendant. During this interval defendants supplied manufactured fuel gas. During the latter part of this period, in the late 1920's, oil drillers uncovered in the Pan Handle area of Texas a natural gas field which proved to be the largest that had ever been found. Thereby the transmission of the gas by pipe line to remote cities became feasible. Early in 1930 defendant, in conjunction with certain other Illinois utility companies, formed a combination with a number of large oil companies to build a gas pipe line from Texas to Joliet, Illinois, and later joined with the other Illinois utilities alone to build a connecting pipe line from Joliet to Chicago. Defendant was authorized by law to supply natural gas. It faced two problems, one was the procuring of the consent of the Illinois Commerce Commission to a change in the heating value of the gas. The other had to do with the rates. Defendant's rates throughout its history had always been stated on the so-called "volumetric" basis, at so many cents per cubic foot of gas. It was understood, however, that in a properly adjusted appliance the quantity of gas used by the customer depends not upon the volume of the gas, but upon the amount of heat contained in it. On June 11, 1930 defendant applied to the commission for permission to state its rate in the alternative, both on a volumetric and on a thermal basis, and to render all bills on the thermal basis, except to customers who might specifically request the old volumetric bill. Plaintiff was notified of the hearing by the commission and was a party to it. Plaintiff did not object to the change, but insisted that the advantages in any cheaper methods of gas production should be shared with gas users in the form of lowered rates, whether the billing be on the heating basis (therm basis) or the cubic feet basis. Although the purpose of the change was to lay a foundation for the introduction of natural gas, plaintiff did not announce its claim to compensation out of

the revenue of the sale of such gas. On July 29, 1930 the commission approved the proposed change in the billing. Plaintiff had ample notice, more than a year in advance of the arrival of natural gas from the Pan Handle. Defendant was not paying plaintiff compensation on any account at the time. On August 26, 1931 defendant offered to make a 3½ per cent reduction in its general rates and a 22 per cent reduction in its house heating rates, effective October 1, 1931, by which time it was thought the natural gas would be in the mains. Defendant's request for a change in the heating value of the gas and its proposed reduction in rates were heard together by the commission, and considerable evidence was offered by defendant. Included in such evidence was an estimate of its operating expenses for the years 1932 and 1933, as such expenses would be after the natural gas had entered into its operations. This estimate tabulated every item of operating cost which defendant expected to encounter. It included no amount to cover any compensation to plaintiff of five per cent, or otherwise. Plaintiff, up to October 1, 1931, introduced no evidence, but its counsel was present at all times and was able to and did study and cross-examine upon the showing made by defendant. No question was raised by plaintiff as to the absence of an item in its operating expenses to cover compensation to plaintiff. He argued then, as on every other occasion, that the rates should be reduced. On October 1, 1931 the commission entered an order approving the requested 800 BTU standard for gas and at the same time ordered defendant to reduce its general charges 6½ per cent and its house heating charges 31 per cent. This was in accord with plaintiff's position that rates should be reduced to the utmost limit. Had plaintiff at this time interposed a claim for five per cent of defendant's revenue on the sale of natural gas, that payment would necessarily have become an item of operating cost in defendant's accounts.

Defendant put into effect the decrease in its rates required by the commission's order and shortly thereafter it began supplying natural gas in Chicago. After the reduced rates were placed in effect, plaintiff, by its counsel, continued its effort for further reduction in rates. Extensive and protracted hearings thereafter were conducted by the commission in which the plaintiff took an active part. Its counsel on April 26, 1932 asked a witness for defendant to prepare for plaintiff's use before the commission an estimate of defendant's earnings projected through 1934 and 1935, which estimate defendant produced, and which, at plaintiff's request, was made a part of the record. This statement of defendant's operating costs did not contain any reference to any compensation due to plaintiff and a breakdown of the figures giving the cost of natural gas to defendant showed that no such item of compensation was there included.

Plaintiff put on the stand a witness, Walter S. Bemis, who testified to his estimate of defendant's net earnings for the four years, 1932 to 1935 inclusive, as an alternative to defendant's estimates. In this exhibit Mr. Bemis began with defendant's figures for its operating expenses and then modified them by showing the effect of certain suggested changes in the use of purchased coke oven gas. The witness did not include in his estimate of operating cost any item to cover compensation to plaintiff. Another witness, Frank P. Fisher, who submitted an estimate of defendant's earnings, did not include any item of cost to cover compensation to plaintiff. The case was closed late in 1932 and briefs were filed in January 1933. Defendant's position was that as a result of the order of October 1, 1931, it was no longer earning a fair return upon the value of its property. Plaintiff argued for a further rate reduction and concluded with a summary of suggested revenues and operating expenses which would support its argument for a further reduc-

tion in rates. This summary did not contain any item of expense representing compensation payable to plaintiff by reason of the sale of natural gas, or on any other account.

The legislature, during its 1935 session, passed the three per cent public utility tax Act, which became effective July 1, 1935. Defendant immediately asked the commission to increase its rates by an amount sufficient to cover the tax. Plaintiff opposed the request. Defendant again filed statements of its revenues and operating expenses, this time for 1935 and 1936. These did not contain any item to cover compensation to plaintiff. At the hearing plaintiff did not contend or suggest that there should be included in defendant's costs any item on account of compensation to it by reason of the sale of natural gas. On June 12, 1936 the commission denied the request for the three per cent increase. From 1936 until 1940 plaintiff opposed efforts by defendant to obtain an increase in its rates, basing its opposition upon statements of operating expenses which did not include any item of compensation payable to plaintiff. The long continued and consistent course of practical construction given to the 1906 ordinance confirms the interpretation relied upon by defendant. It is unnecessary to discuss the remaining points urged by plaintiff.

For the reasons stated, the judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

LEWE, P. J., and KILEY, J., concur.